DA 12-0139

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 336

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

JILL MARIE LOTTER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2010-348
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jennifer A. Hurley, Hurley Kujawa, PLLC; Butte, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General; Helena, Montana

      Leo J. Gallagher, Lewis and Clark County Attorney, Melissa Broch, Deputy
County Attorney; Helena, Montana

Submitted on Briefs:  September 25, 2013
Decided:  November 12, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 A jury in the First Judicial District Court, Lewis and Clark County, found Jill Marie Lotter guilty of the attempted deliberate homicide of her husband, Mike, and the court entered judgment against her. Lotter appeals. We affirm.

¶2 We address the following issues on appeal:

1. *Did the District Court err when it excluded Lotter's proposed expert witness testimony about the behaviors of individuals in abusive relationships and their diagnoses of Lotter with post-traumatic stress disorder (PTSD)?*

2. *Did the District Court err when it admitted Mike's alleged prior inconsistent statement to a volunteer firefighter responding to a medical emergency, when Mike could not remember making the statement?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The State of Montana charged Lotter with the attempted deliberate homicide of her then-husband, Mike, at the family home on November 9, 2010. Lotter filed noticed of her intent to present evidence of her good character and to rely upon the affirmative defense of justifiable use of force.

¶4 Before trial, Lotter moved to exclude testimony of a volunteer firefighter that, when the firefighter responded to a 911 call from the Lotter home on November 9, Mike muttered, "This is the third time she has tried to kill me." Lotter argued that Mike's statement did not fit within any recognized hearsay exception and that, if Mike did not testify at trial, admission of the firefighter's testimony would violate her right to confront witnesses against her, under the Confrontation Clause of the United States Constitution and Article II, Section 24 of the Montana Constitution. In response, the State argued that Mike was expected to

2

testify at trial and that, because he could not remember making the statement, it was admissible under the hearsay exclusion for prior inconsistent statements, M. R. Evid. 801(d)(1)(A). Following a pretrial hearing, the court denied the motion to exclude. It ruled that, if Mike testified, the statement would be admissible as a prior inconsistent statement under M. R. Evid. 801(d)(1)(A) and as an excited utterance pursuant to M. R. Evid. 803(2), and that if he did not testify, it would be admissible as a nontestimonial statement under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).

¶5    Lotter also filed pretrial notice of her intent to call Dr. William Stratford and Dr. Mary Jo Jeffres as expert witnesses on the behaviors of individuals in abusive relationships. In response, the State moved to exclude any testimony as to Lotter's state of mind at the time she committed the offense. Observing that Lotter had not interposed a defense of mental disease or defect, the District Court prohibited Lotter from presenting expert testimony on whether she had the capacity to act with purpose or knowledge, or that her capacity was diminished by some psychological issue. The court ruled, however, that, if Lotter established the necessary foundation at trial, the experts may testify about battered woman syndrome and characteristics unique to that syndrome.

¶6    At trial, the State presented evidence that, in the autumn of 2010, Mike and Jill Lotter were facing financial difficulties as they neared the 10th anniversary of their marriage. Mike had lost his job as a management consultant, their savings had been depleted, and they had accumulated substantial credit card debt, largely from Lotter's self-admitted "addiction" to making penny auction purchases on the Internet. In addition, on two occasions during that

3

autumn, Mike had been hospitalized for serious injuries from unexplained falls in the family home. During those hospitalizations, Lotter had reported that Mike had been taking her antianxiety and sedative medications, and toxicology tests after his falls confirmed the presence of those medications in his system. Mike also was diagnosed with epilepsy and was prescribed medication to treat epilepsy.

¶7 At trial, Mike testified that he had never suffered from epilepsy before the autumn of 2010, and that he neither currently suffered from it nor continued to take any medication for it. He testified that his memory of how he suffered his injuries during that autumn was unclear. In particular, his memory of the events of November 9 was very limited. He testified that he remembered lying on his back with his hands pinned down and a huge, painful weight on his chest, and then seeing Lotter's arm swing, after which everything went black.

¶8 Lotter testified that she found Mike at the bottom of a flight of stairs inside the house on the morning of November 9, after he apparently fell from the top of the stairway. She went to him and was preparing to help him change his underwear, which were wet, when he called her by his ex-wife's name and accused her of trying to kill him. Lotter testified she was afraid of Mike and tried to pull away, but that he grabbed her and pulled her down, trying to choke her. She eventually crawled into the adjacent laundry room and picked up a hammer sitting on top of the water heater. Mike grabbed her again and would not let her go, so she hit him on the head with the hammer. She begged him to let her go, but he would not do so; at one point he took the hammer from her and hit her on the head. Lotter passed out;

4

when she came to, Mike told her to go take a shower, get in the car, and kill herself. Lotter testified that these events transpired over the course of about 3 hours. She took a shower, gathered some belongings, got into her car, and started down the driveway. When Lotter saw that her friend and neighbor was home, she went over to the neighbor's house.

¶9 Lotter's neighbor testified that, shortly after noon on November 9, 2010, Lotter knocked on her door and asked her to talk, because "Mike attacked me." Lotter told the neighbor that she had hit Mike in the head with a hammer. The neighbor convinced Lotter to return with her to check on Mike. When they went to Lotter's home, Mike was lying near the staircase inside the front door. His head was very bloody. The neighbor feared he might be dead, until she saw him move his arm. When the neighbor asked Lotter for a phone to call 911, Lotter replied that she did not have a phone with her. The neighbor ran home to use her phone to make the call.

¶10 Both Lotter and Mike were taken to the hospital. Mike was transferred by emergency flight to a hospital in Great Falls, where he was treated for a depressed skull fracture, multiple facial fractures, and over 20 lacerations. He had been hit in the head with the claw end of a hammer approximately 20 times. In contrast, none of Lotter's injuries were serious, and they did not require followup.

¶11 Lotter testified that, during her marriage to Mike, he made demeaning comments to her, including telling her she was too sensitive, she was irresponsible, she didn't handle her sons correctly, and she was the craziest and stupidest person he had ever known. He made trivial demands about how to load the dishwasher and how to fold his laundry. He

5

discouraged her friendships and preferred to be with her alone. Lotter testified that Mike would go into a "rage" every six months or so, but she did not identify any specific conduct by him during his "rages." The District Court ruled that the evidence Lotter presented did not provide a sufficient foundation to support the admission of the testimony of her proposed expert witnesses on battered woman's syndrome and PTSD.

¶12 The jury found Lotter guilty of attempted deliberate homicide. The District Court entered judgment requiring her to serve forty years at Montana Women's Prison. Lotter appeals.

## STANDARD OF REVIEW

¶13 A district court has broad discretion when determining the relevance and admissibility of evidence, and we generally review evidentiary rulings for abuse of discretion. *State v. Daniels*, 2011 MT 278, ¶ 11, 362 Mont. 426, 265 P.3d 623. To the extent that the trial court's ruling is based on an interpretation of a rule of evidence or a statute, however, our review is de novo. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.

## DISCUSSION

¶14 *Did the District Court err when it excluded Dr. Stratford's and Dr. Jeffres' expert witness testimony about the behaviors of individuals in abusive relationships and their diagnoses of Lotter with PTSD?*

¶15 Montana Rule of Evidence 702 provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine

a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

¶16    This Court first addressed the admissibility of evidence concerning battered woman syndrome in *State v. Stringer*, 271 Mont. 367, 897 P.2d 1063 (1995). There, we recognized that the term is used to describe "common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." *Stringer*, 271 Mont. at 375, 897 P.2d at 1068 (citation omitted). Before expert testimony on battered woman syndrome may be admitted, there first must be evidence of a battered victim. We declined to set "hard and fast foundational requirements" for establishing that a person is a battered woman, instead leaving those foundational decisions to the sound discretion of the trial court on a case-by-case basis:

> [T]he party seeking to introduce battered woman syndrome evidence must lay an appropriate foundation substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.

*Stringer*, 271 Mont. at 378, 897 P.2d at 1070.

¶17    Here, Lotter maintains she provided sufficient evidence that she was emotionally abused by Mike to justify admission of her proposed experts' testimony on battered woman syndrome. At oral argument before this Court, Lotter's counsel cited, as foundation for the admission of such expert testimony, Lotter's testimony about Mike's criticism of and trivial demands on her, and Mike's testimony that sometimes when Lotter told him she would be

working late he drove by her office to see if she really was there—which counsel characterized as evidence that Mike stalked Lotter.

¶18    In *State v. Hanks*, 817 N.W.2d 663 (Minn. 2012), the Supreme Court of Minnesota upheld a trial court's determination that evidence of a troubled relationship between a woman and her romantic partner was not sufficient to provide a foundation for the admission of expert testimony on battered woman syndrome. There, defendant Hanks, who was charged with both first- and second-degree murder of her romantic partner, offered evidence that her partner was not involved in the lives of his children, preferred that Hanks stay at home with the children rather than work outside the home, controlled the family finances and did not give Hanks money, got angry when Hanks went out socially, disabled Hanks' vehicle so she could not drive it, and made threats to kill Hanks, his children, and himself. The Minnesota Supreme Court held that the trial court did not abuse its discretion in finding the evidence of a troubled relationship was insufficient to establish the type of relationship that would give rise to battered woman syndrome. *Hanks*, 817 N.W.2d at 669.

¶19    Having reviewed the record, we cannot say the District Court abused its discretion in ruling that Lotter had failed to produce an adequate evidentiary foundation in this case for the admission of expert witness testimony about the behaviors of individuals in abusive relationships. Lotter presented no evidence other than demeaning or degrading comments Mike may have made, from prior to November 9; nor did her vague testimony about rages establish the multiple cycles of violence necessary to provide a foundation for battered woman syndrome. *See Stringer*, 271 Mont. at 378, 897 P.2d at 1070.

8

¶20    Lotter argues that, even if she did not adduce enough evidence to provide a foundation for the admission of expert testimony about battering and its effects, she was entitled to present Dr. Stratford's testimony about his testing and his PTSD diagnosis of her, under § 46-14-213, MCA. Pretrial, the District Court correctly refused to admit such testimony for purposes of establishing that Lotter lacked the capacity to act with purpose or knowledge or that her capacity was diminished because of a psychological issue, on grounds that Lotter had not given notice of intent to rely on a mental disease or defect defense. After reviewing the record, we concur with the State's position on appeal that the information provided to the District Court indicated the diagnoses of PTSD were based solely on the premise that Lotter suffered from battered woman syndrome. Therefore, if expert testimony on battered woman syndrome was not admissible, expert testimony on PTSD was not admissible, either.

¶21    Lotter claims the State put her "psychological diagnosis" at issue when it called Michelle Cuddy to testify. Cuddy, a licensed clinical professional counselor and crisis response team therapist, testified that she consulted with Lotter at the emergency room on November 9, 2010, after Lotter's mother told a physician's assistant who examined Lotter that Lotter was suicidal. Cuddy described her interaction with Lotter at the hospital and what Lotter told her had transpired earlier on that date, and her six pages of notes from her consultation were introduced into evidence. Cuddy testified that she perceived no indication that Lotter was intending to kill herself and, in response to a question on redirect examination, stated she "absolutely believed" that Lotter was "completely sane."

9

¶22 We conclude Cuddy's testimony did not open the door for broader psychological diagnosis evidence. Lotter did not present the jury with a mental disease or defect defense, so was not challenging her "sanity." Cuddy did not testify as an expert witness on Lotter's overall psychological diagnosis, nor did Lotter propose to offer testimony by Dr. Stratford to refute Cuddy's conclusion that Lotter was not suicidal.

¶23 Lastly, Lotter complains that the prosecution preyed on common misconceptions about victims of domestic violence during closing arguments at trial, "openly mocking [Lotter's] allegations of abuse as mere 'annoyances.'" However, no objections were made to the referenced remark during closing argument at trial, nor has the propriety of remarks made by the prosecution during closing argument been raised as an issue on appeal.

¶24 We hold that the District Court did not err in excluding Dr. Stratford's and Dr. Jeffres' expert testimony about the behaviors of individuals in abusive relationships and their diagnoses of Lotter with PTSD.

¶25 *Did the District Court err when it admitted Mike's alleged prior inconsistent statement to a volunteer firefighter responding to a medical emergency, when Mike could not remember making the statement?*

¶26 As indicated above, Lotter's pretrial motion to exclude evidence of Mike's statement to the volunteer firefighter was based on (1) her Sixth Amendment right to confront witnesses; and (2) an argument that the statement did not fit within any exception to the general prohibition on admission of hearsay evidence.

¶27 The Confrontation Clause argument was based on the United States Supreme Court's opinion in *Crawford*, which this Court first applied in *State v. Mizenko*, 2006 MT 11, 330

10

Mont. 299, 127 P.3d 458. The Confrontation Clause holdings of those cases relate to instances in which the declarant does not testify at trial. Because Mike testified at trial, there was no Confrontation Clause issue concerning the evidence of his November 9 statement, and the requirements set forth in *Crawford* and *Mizenko* do not apply. Accordingly, Lotter makes no Confrontation Clause argument on appeal.

¶28 We turn to the hearsay argument. Hearsay is a statement, other than one made by the declarant while testifying at the trial, that is offered to prove the truth of the matter asserted. M. R. Evid. 801(c). Hearsay generally is not admissible into evidence. M. R. Evid. 802. A statement is not hearsay, however, if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony. M. R. Evid. 801(d)(1)(A).

¶29 On appeal, Lotter does not contest that the firefighter's testimony was admissible under M. R. Evid. 801(d)(1)(A). She acknowledges that, under *State v. Lawrence*, 285 Mont. 140, 159, 948 P.2d 186, 198 (1997), a declarant's lapse of memory is an inconsistency within the meaning of that rule, and the witness may be impeached or rehabilitated with evidence of the earlier statement.

¶30 Lotter argues, however, that the admissibility of a prior inconsistent statement may be limited by factors other than hearsay, and maintains Mike's November 9 statement was inadmissible as a matter of due process, because it was inherently unreliable. Citing *State v. White Water*, 194 Mont. 85, 634 P.2d 636 (1981), she references the circumstances under

11

which the statement was made, plus "[t]he defense had no ability to cross-examine [Mike] on his making of the statement."

¶31    Lotter raises this due process argument for the first time on appeal. Generally, we will not consider new legal theories raised for the first time on appeal because " 'it is unfair to fault the trial court on an issue it was never given an opportunity to consider.' " *State v. Montgomery*, 2010 MT 193, ¶ 11, 357 Mont. 348, 239 P.3d 929, *quoting State v. Courville*, 2002 MT 330, ¶ 5, 313 Mont. 218, 61 P.3d 749. We will adhere to that general rule here.

¶32    We conclude Lotter has failed to establish that the District Court abused its discretion when it admitted the firefighter's testimony about what Mike said to him.

¶33    Because we have concluded the District Court did not err in either of the above rulings, we need not address the third issue Lotter raised on appeal: whether we should reverse her conviction under the cumulative error doctrine.

¶34    We affirm the judgment entered by the District Court.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE