FILED

September 15 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0138

DA 14-0138

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 273

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

WILLIAM PATRICK GIVEN,

       Defendant and Appellant.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and For the County of Yellowstone, Cause No. DC 11-0377
                    Honorable Mary Jane Knisely, Presiding Judge


COUNSEL OF RECORD:

       For Appellant:

              Jack E. Sands, Attorney at Law, Billings, Montana

       For Appellee:

              Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
              Attorney General, Helena, Montana

              Scott Twito, Yellowstone County Attorney, Ann Marie McKittrick,
              Julie Patten, Deputy County Attorneys, Billings, Montana


                      Submitted on Briefs:  July 15, 2015
                                Decided:  September 15, 2015

Filed:

                               Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      William Patrick Given appeals from the judgment entered against him by the Thirteenth Judicial District Court, Yellowstone County, following his jury conviction of sexual assault in violation of § 45-5-502, MCA.  We affirm.

¶2      We review the following issues:

*Issue 1: Whether the District Court abused its discretion when it permitted A.U. to testify about prior sexual abuse by Given.*

*Issue 2: Whether the District Court abused its discretion when it limited the defense examination of witnesses regarding specific instances of conduct.*

*Issue 3: Whether the District Court abused its discretion when it admitted testimony from the State's expert witness Wendy Dutton.*

**BACKGROUND**

¶3      In April of 2011, Detective Kevin Cunningham of the Yellowstone County Sheriff's Office responded to a report of sexual abuse of K.F., a ten-year-old boy, which K.F. had disclosed to a school counselor.  During Cunningham's interview of K.F., the boy disclosed three incidents in which his neighbor, Given, had touched him inappropriately during the previous year:  at his own home, at Given's home, and while the two were on a camping trip.  Cunningham interviewed several other people, including K.F.'s mother and her cousin C.H., who was Given's boyfriend and lived with Given next door to K.F.'s family.

¶4      Given was arrested and advised of his Miranda rights, after which he gave a statement to Detective Cunningham.  Given stated that on one occasion K.F. had complained of a rash on his genitals and Given provided K.F. lotion to put on the rash.

2

Given denied touching K.F.'s genitals, having K.F. masturbate in front of him, or kissing K.F. on the mouth, as K.F. had reported. Given acknowledged that he walked in on K.F. masturbating and watched him. He also admitted kissing K.F. on the cheeks, showing him pornographic videos featuring gay men, and giving K.F. a cell phone without his parents' knowledge.

¶5      The State charged Given with felony sexual assault and failure to register as a sexual offender. Given moved the District Court to sever the charge of failure to register, and the court granted that motion.

¶6      During discovery, the State gave notice of its intent to call Given's sister A.U. as a witness at trial. In 1995, Given had admitted and been convicted of sexual assault against A.U. from the time she was six years old until she was eleven. Given opposed allowing A.U. to testify about the events leading to that conviction, and he filed a motion in limine to exclude A.U.'s testimony as inadmissible under M. R. Evid. 404(b). The District Court held a hearing and later issued an order denying Given's motion in limine and allowing the State to present A.U.'s testimony.

¶7      The State asked the District Court to exclude all evidence that K.F. had been abused by his stepfather, all references to the status of Given's boyfriend C.H. as a registered sex offender, and all evidence from K.F.'s counseling records and Department of Family Services records. The court granted the first two of those motions, ordering that any allegations of sexual abuse of K.F. by his stepfather be excluded from evidence and prohibiting reference to C.H.'s sex offender status at trial. Additionally, the court ordered evidence from K.F.'s records excluded unless it was "appropriate to delve into

3

certain matters on cross-examination pursuant to the exceptions contained in Rule 608 or pursuant to Rule 801."

¶8       The case proceeded to a jury trial in early January of 2013. The State's witnesses included K.F., his mother and his stepfather, Detective Cunningham, A.U., and forensic interviewer Wendy Dutton.

¶9       K.F.'s mother testified that she met Given through her cousin C.H. and that the couple later moved in next door to her family. She recalled how Given and K.F. spent time together fishing, camping, and playing video games, and that K.F. also spent time at Given's home. K.F.'s mother testified that Given favored K.F. over her other children and bought him gifts including a cell phone, a television, a fishing pole, and a knife. She testified that, for a while, K.F. seemed to enjoy spending time with Given, but that in the fall of 2010, K.F. began to say that he hated Given and did not want to talk to him or see him. On cross-examination, she testified that K.F. sometimes told lies, some of which were of a serious and harmful nature, but that his lies were no more frequent than an average boy his age.

¶10     K.F. testified to three instances of inappropriate conduct by Given. He testified that in the first incident, Given entered K.F.'s room and instructed him to lie on the floor and pull his pants down. K.F. testified that Given then placed lotion on K.F.'s penis and rubbed it. K.F. told the jury his penis "stood straight up" and then "some white stuff came out." K.F. also testified that Given made him stick his penis in a stuffed animal and showed him websites about gay men, including violent scenes of men whipping each other.

4

¶11    K.F. testified to a second incident, when he went camping with Given, A.U., and A.U.'s family. The group slept in Given's camp trailer. A.U. and her family stayed one night, while Given and K.F. camped for two nights. K.F. stated that Given cuddled him at night and K.F. woke up with his lower body wet and sticky. K.F. further testified that Given asked K.F. to rub lotion on his penis, but K.F. refused and Given did not persist.

¶12    K.F. testified to a third incident, at Given's home, which K.F. would frequently visit. K.F. told the jury Given wanted him to rub lotion on his penis and that Given put his hand down K.F.'s pants and kissed K.F. on the mouth. Additionally, K.F. testified that Given showed K.F. a dildo and stated, "Soon when you get old enough, you will stick this up your butt." K.F. then told Given to stop, and left the house because he felt uncomfortable.

¶13    K.F. testified to numerous gifts Given had given him, including a cell phone, a fishing pole, a knife, a television, and sunglasses. According to K.F., Given specifically instructed him not to tell his mother about the cell phone or the knife.

¶14    During cross examination of K.F., Given's counsel demonstrated that K.F.'s story had inconsistencies and that K.F. had lied about his family. K.F. acknowledged calling the authorities and telling hurtful lies about his parents, including that he was afraid to go home. K.F. maintained, however, that he did not make up stories about Given.

¶15    Prior to the testimony of Given's sister A.U., the District Court instructed the jury that the evidence of Given's prior acts was for the limited purpose of showing his intent or absence of mistake. The District Court warned that the evidence could not be used for

any other purpose and the jury was to decide whether or not to convict based only on the crimes charged, not any other crimes or wrongs.

¶16 A.U. identified Given as her half-brother. She recalled going camping with her four children, K.F., and Given in Three Forks, Montana. A.U. testified that, on the camping trip, Given and K.F. spent time alone behind a closed bedroom door. A.U. did not know where K.F. slept during the night. A.U. stated she had noticed that Given's behavior toward K.F. was similar to his behavior towards her when she was young. Specifically, she discussed how he purchased K.F. a fishing pole and sunglasses, but did not buy gifts for the other children. A.U. noted that Given had given her special attention as a child and bought her gifts or took her to the park. She testified that this special attention "led to him molesting me."

¶17 Over Given's objection, the District Court permitted the State to question A.U. about the abuse. A.U. testified to a slow escalation of sexual violence starting with touching when she was six years old, and progressing to Given inserting objects into her vagina and eventually full intercourse when she was eleven years old.

¶18 The State presented expert testimony by Wendy Dutton, a forensic interviewer for a child protection team at a Phoenix, Arizona, children's hospital. Dutton testified that she had been a forensic interviewer of children for over 20 years, and had interviewed over 8,000 claimed child victims of sexual abuse. She testified she had not reviewed any of the materials for this case, and she did not testify about this case. She testified that, generally, boys tend to delay disclosure longer than girls; and she listed some reasons for that. She testified that piecemeal disclosure is common and that recantation of disclosure

6

occurs in a minority of cases. She described the process of victimization, including victim selection, engagement, grooming, assault, and concealment. She also described the variety of symptoms shown by victims of sexual abuse, including depression, difficulty in school, aggression, and temper tantrums. She testified that malicious false reports—reports that are made for some ulterior motive or secondary gain—typically occur in situations in which the child's parents are involved in a high conflict divorce or custody dispute. She described techniques for interviewing children and discussed characteristics of children's memories. Her testimony was based on both her own research and others' research in the field.

¶19 K.F.'s stepfather testified that he had observed that K.F. and Given were very close for some time, but that K.F.'s attitude later changed into one of apparent intense dislike for Given. Given's boyfriend C.H. echoed that testimony, telling the jury that Given and K.F. had once seemed to enjoy watching television and playing video games together, but that K.F. appeared angry with Given and did not want to be around him beginning in November or December of 2010.

¶20 Given testified on his own behalf. He stated he had a special interest in K.F., and that he related to him as he, like K.F., had been an ostracized child. According to Given, he saw K.F. once or twice a week. Given admitted to buying gifts for K.F., including a cell phone despite instructions from K.F.'s mother that he wait until she consulted her husband about that gift.

¶21 Regarding the specific allegations of sexual abuse, Given denied ever touching K.F. He testified that on the camping trip to Three Forks, he slept on the floor next to the

7

queen-sized bed in the camper and that K.F. slept in the bed. He admitted that he had walked in on K.F. masturbating in K.F.'s bedroom and had observed him instead of walking away. He stated he had observed this because he was curious about starting his own family. Given also admitted to giving K.F. lotion for a rash, stating he "put some lotion in [K.F.'s] hands and told him to reach down his pants and rub his crotch." He denied assisting K.F. in applying the lotion. Given also testified that he kissed K.F. on the corner of the mouth or the cheeks. Given admitted to showing K.F. gay pornography. He acknowledged that this was a mistake, but stated he decided to show K.F. the pornography because "he was interested in becoming gay."

¶22 The jury found Given guilty of felony sexual assault. Given later entered a nolo contendere plea on the charge of failure to register as a sexual offender. He was sentenced to the Montana State Prison for seventy years with twenty years suspended on the sexual assault charge, and was committed to the Department of Corrections for two years for failure to register as a sex offender, to run concurrently to the sexual assault sentence. Given appeals.

## STANDARDS OF REVIEW

¶23 A district court has broad discretion when determining the relevance and admissibility of evidence. Accordingly, we generally review evidentiary rulings for abuse of discretion. *State v. Lotter*, 2013 MT 336, ¶ 13, 372 Mont. 445, 313 P.3d 148. A district court abuses its discretion when it acts arbitrarily, without conscientious judgment, or exceeds the bounds of reason. *State v. Franks*, 2014 MT 273, ¶ 11, 376

8

Mont. 431, 335 P.3d 725. To the extent the court's ruling is based on a rule of evidence, a statute, or a constitutional right, our review is de novo. *Lotter*, ¶ 13.

**DISCUSSION**

¶24 *Issue 1: Whether the District Court abused its discretion when it permitted A.U. to testify about prior sexual abuse by Given.*

¶25 As indicated above, Given moved in limine to prevent A.U. from testifying about the events that resulted in his 1995 conviction of sexual assault. Given pointed out that, under M.R. Evid. 404(b), evidence of other acts may not be used to prove a person's character in order to show that the person acted in conformity with that character. In response, the State asserted that such evidence may be used for certain other purposes, and argued the evidence went to establishing Given's intent, the absence of mistake, and the common scheme of grooming used to perpetrate the abuse. After a hearing on the motion in limine, the District Court permitted the State to use A.U.'s testimony at trial for the "limited scope and purpose of demonstrating intent and absence of mistake." The court prohibited introduction of any evidence of Given's prior criminal conviction for the assault on A.U. and his subsequent sex offender treatment, unless Given "opens the door." Additionally, before A.U. testified, the court instructed the jury of the limited scope for which it may consider this evidence, pursuant to M. R. Evid. 105:

> Evidence of other acts. The State has offered evidence that the defendant at another time engaged in crimes, wrongs, or acts. That evidence was not admitted to prove the character of the defendant or in order to show that he acted in conformity therewith. The only purpose of admitting that evidence was to show the intent or absence of mistake or accident. You may not use that evidence for any other purpose. The defendant is not being tried for the other crime, wrong, or act. He may not be convicted for any offense other than that in this case. For the jury to convict the defendant of any

9

other offense other than that charged in this case may result in an unjust double punishment of the defendant.

Given argues admission of A.U.'s testimony constitutes error for several reasons.

¶26 Given first argues the District Court used an incorrect standard by requiring him to disprove the evidentiary basis for the State's evidence. He is incorrect.

¶27 Under the post-*Just* and *Matt* interpretation of M. R. Evid. 404(b) articulated in *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, 358 Mont. 325, 246 P.3d 415, a prosecutor must disclose her intent to introduce evidence of other crimes, wrongs, or acts. The prosecution is not required to explain, initially, why the evidence is admissible. *Eighteenth Jud. Dist. Ct.*, ¶ 49. After the prosecution discloses its intent, the defense must identify authority under which the prosecution's evidence should be excluded. At that time, the prosecutor must respond to the defense's objections and demonstrate the evidence's admissibility. The court may then conduct a hearing before it issues a written decision. If the court determines the evidence is admissible, the defendant may request an instruction on the limited purpose for which the evidence is admissible, pursuant to M. R. Evid. 105. *Eighteenth Jud. Dist. Ct.*, ¶ 49.

¶28 In this case, the court followed the above process, including requiring the State to demonstrate the admissibility of the evidence at a hearing on Given's motion in limine and giving an instruction on the limited scope for which the jury may consider the evidence.

¶29 Given further argues the District Court erred in reasoning that A.U.'s testimony about his sexual assaults on her was relevant to prove intent and mistake, because he had

never claimed mistake or lack of intent. But, as the District Court specifically noted, when Given was initially confronted with K.F.'s allegations, he claimed he merely made the mistake of failing to leave the room after walking in on K.F. masturbating, and that he provided K.F. lotion for a rash on his genitals. The District Court identified these responses as the claimed mistake. The court concluded that A.U.'s testimony was admissible under M. R. Evid. 404(b), as it was offered to demonstrate intent and absence of mistake.

¶30 Our review of the record convinces us that the District Court was correct. Given acknowledged the truth of portions of K.F.'s testimony, but claimed his observation of K.F. masturbating and his supplying K.F. with lotion to rub on his penis were accidental or harmless acts. A.U.'s testimony was admissible as evidence of absence of mistake as well as intent.

¶31 Given states the District Court failed to articulate any basis for introducing evidence about events remote in time and with no similarity to the charged crime. However, neither nearness in time nor similarity is a prerequisite for the admission of evidence of other crimes, wrongs, or acts. *Eighteenth Jud. Dist. Ct.*, ¶ 56. As to similarity, Given argues there were significant differences between the incidents of claimed abuse (gender of victims, family member status, and threats of violence to A.U. but not to K.F.) and that these dissimilarities made A.U.'s testimony inadmissible under M. R. Evid. 404(b). We disagree. Similarities between the events involving A.U. and those involving K.F., as noted by the District Court, include that both incidents involved young children with whose care Given had been entrusted and that, in both cases, Given

11

had given special favors and generous gifts to the victims far in excess of what he did for their siblings.

¶32 Finally, Given asserts that A.U.'s testimony served no other purpose than to establish character evidence of his propensity to commit sexual assault, and that the probative value was substantially outweighed by the risk of unfair prejudice. He points to the highly inflammatory nature of child molestation evidence, as recognized in *State v. Franks*, 2014 MT 273, 376 Mont. 431, 335 P.3d 725.

¶33 M. R. Evid. 403 does not require the exclusion of relevant evidence simply because it is prejudicial. Rather, such evidence is inadmissible only when it will prompt the jury to decide the case on an improper basis. *State v. Stewart*, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187. In conducting its analysis in this case, the District Court concluded A.U.'s testimony was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice. And the court instructed the jury on the limited purpose for which the evidence could be used—to show intent or absence of mistake or accident.

¶34 We hold the District Court did not abuse its discretion by allowing into evidence A.U.'s testimony about Given's abuse of her when she was a child.

¶35 *Issue 2: Whether the District Court abused its discretion when it limited the defense examination of witnesses regarding specific instances of conduct.*

¶36 Given claims, broadly, that the District Court abused its discretion in restricting his ability to examine witnesses. He contends that his constitutional right to confront the witnesses against him was violated by the District Court's rulings. In particular, he

12

makes three arguments. He first argues he should have been allowed to cross-examine K.F. about a claim K.F. may have made that his stepfather had sexually abused him. Given also argues he should have been allowed to inquire about the sexual offender status of C.H. Finally, he argues he should have been allowed to inquire about all information in K.F.'s Department of Family Services (DFS) files and counseling records.

¶37 We first address Given's claim that he should have been allowed to cross-examine K.F. about an allegation K.F. may have made to a counselor that his stepfather had sexually abused him. Reference to such an allegation appears in K.F.'s sealed counseling records but, following the District Court's review of those records, the court concluded "it was not shown that he ever made an accusation. It is extremely possible that there was an error in the reporting process." We have stated that a defendant's right of confrontation is not violated by the exclusion of evidence concerning the victim's past sexual abuse by other individuals unless the victim's accusations of prior abuse have been proven or admitted to be false. *State v. MacKinnon*, 1998 MT 78, ¶ 35, 288 Mont. 329, 957 P.2d 23; *State ex rel. Mazurek v. District Court*, 277 Mont. 349, 356, 922 P.2d 474, 479 (1996). In this case, not only is it unclear whether such an accusation was true or false, it is unclear whether K.F. ever made such an accusation. Therefore, we hold that the District Court did not abuse its discretion when it refused to allow Given to cross-examine K.F. about this matter.

¶38 In prohibiting introduction of evidence of C.H.'s sexual offender status, the District Court relied on M. R. Evid. 609: "For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is not admissible." As

13

the court noted, Given suggested no purpose for such evidence other than for attacking C.H.'s credibility. Given was not relying on the defense of mistaken identity, and K.F. never accused C.H. of molesting him. We hold the District Court did not abuse its discretion in prohibiting Given from cross-examining C.H. on his sexual offender status.

¶39   Finally, we address the District Court's rulings on the admissibility of evidence from K.F.'s counseling and DFS files that he had made false statements. One way of impeaching a witness is to introduce evidence that the witness has a bad character for truthfulness. M. R. Evid. 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

¶40   The District Court allowed witnesses to testify that K.F. had made false statements that were harmful. The court allowed questioning of K.F.'s mother about whether K.F. had made reports to school and other authorities that he was afraid to go home, and whether there were issues with K.F.'s credibility. K.F.'s mother testified that K.F. "made up a lot of stories" and the stories "are of a serious and harmful nature." She explained that she did not believe K.F. lied more than an average child, but that "he just knows the correct authorities to go to." She acknowledged that K.F. had made reports about her and his stepfather that were not true, and explained that she believed he did so because he had a hard life and it was "a way for him to get rid of his anger."

14

¶41    The court also allowed Given to present the testimony of two counselors who had met with K.F., regarding his reputation for truthfulness.  Both counselors testified that K.F. sometimes embellished his stories.[1]

¶42    The court also allowed Given to cross-examine K.F. about false allegations contained in his DFS file.  Given's counsel asked K.F. whether he had reported hurtful allegations to authorities about his parents that were untrue, and K.F. confirmed that he had.  When asked if he had told authorities that he was afraid to go home, K.F. responded, "Yes.  It was a lie."  K.F. confirmed that he had made up elaborate stories about things that were done to him that were a "figment of [his] imagination."  K.F. explained that he did this because he had just started living with his mother, and he did not know her.  He did not initially like living with his mother because there were "actual rules," and he felt he was being treated unfairly because his brother got more stuff than he did.

¶43    Our review of the record convinces us that the District Court did not abuse its discretion in limiting Given's questioning of witnesses about K.F.'s propensity for truth-telling.  It was reasonable for the court to preserve the integrity of the trial and to prevent it from becoming a trial of K.F. by limiting Given's inquiry to matters concerning K.F.'s credibility and his disclosure that he was abused by Given.

¶44    Given has failed to establish that the District Court abused its discretion in its rulings on examination of witnesses concerning specific incidents of conduct.

---

[1] Only one of those two counselors recalled that K.F. had disclosed to her his allegations about Given.  She testified that K.F.'s demeanor indicated to her that he was truthful about those matters.

15

¶45     *Issue 3:    Whether the District Court abused its discretion when it admitted testimony from the State's expert witness Wendy Dutton.*

¶46     On October 12, 2012, the State filed notice of its intent to call Dr. Wendy Dutton as an expert witness at Given's trial.  The State's notice indicated Dutton would testify about general characteristics of disclosure patterns of child sexual abuse victims, including delayed reporting and dynamics involved when the victim is male and the perpetrator is male; general characteristics of coping strategies of child sexual abuse victims; and general characteristics of the process of victimization, including selection, engagement, grooming, assault, and concealment.[2]  The notice also stated the prosecution would coordinate an interview of Dutton if the defense wished to interview her.

¶47     The defense filed a motion in limine in which it argued that disclosure of Dutton as an expert witness was filed too late.  The District Court denied that motion.  Then, at the beginning of Dutton's trial testimony, defense counsel objected on grounds that there had been inadequate disclosure of the subject of Dutton's testimony and she was not an impartial witness.  The District Court denied that motion and allowed Dutton to testify.

¶48     On appeal, Given argues that the State's delivery to the defense of copies of Dutton's curriculum vitae and her two-year-old doctoral dissertation on "Gender differences in children's disclosures and legal narratives of sexual abuse" was inadequate to comply with the defense's discovery requests.  In those discovery requests—which had been made in June of 2011 and May of 2012—the defense had asked for copies of all

---

[2] We have long recognized such testimony as admissible under M. R. Evid. 702.  *State v. Robins*, 2013 MT 71, ¶ 16, 369 Mont. 291, 297 P.3d 1213; *State v. Morgan*, 1998 MT 268, ¶ 29, 291 Mont. 347, 968 P.2d 1120.

scientific reports and reports produced by all experts, and for written reports and resumes of any experts. Given states his challenge on appeal, however, is not based on timeliness of disclosure of Dutton as a witness.

¶49 Disclosure of witnesses by the State in a criminal case is governed by § 46-15-322, MCA. Subsection (1)(a) of that statute requires disclosure, upon request, of "the names, addresses, and statements of all persons whom the prosecutor may call as witnesses in the case in chief." In addition, the prosecution must provide, upon request, "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case, together with the results of physical examinations, scientific tests, experiments, or comparisons." Section 46-15-322(1)(c), MCA. The State complied with those statutes. Given says making Dutton available for deposition was not enough to demonstrate what her testimony would encompass, but it is unclear what else he would have had the State do.

¶50 We hold that the District Court did not abuse its discretion when it admitted Dutton's testimony into evidence.

¶51 We affirm the judgment entered by the District Court.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE

17