FILED

10/11/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0399

DA 20-0399

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 197

STATE OF MONTANA,

Plaintiff and Appellee,

v.

WILLARD DEAN McCAULOU,

Defendant and Appellant.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC-19-149
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Nick K. Brooke, Stephens Brooke, P.C., Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

Josh Racki, Cascade County Attorney, Jennifer Quick, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs:  August 17, 2022

Decided:  October 11, 2022

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 A jury convicted Willard Dean McCaulou (McCaulou) in the Eighth Judicial District Court, Cascade County, of one count of incest, in violation of § 45-5-507, MCA. McCaulou appeals.

¶2 We affirm and restate the issues as follows:

*1. Were M.M.'s allegations against her four male relatives admissible under an exception to the Montana Rape Shield statute?*

*2. Was McCaulou's Sixth Amendment right to effective assistance of counsel violated when his own counsel elicited expert testimony about false reporting statistics in sexual assault cases dealing with minors?*

*3. Should this Court exercise plain error review to consider expert testimony about false reporting statistics in sexual assault cases?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In 2019, the State charged McCaulou with incest for conduct that occurred while the victim, M.M., was between ages four and seventeen. He has denied all allegations.

¶4 M.M. belongs to a Mennonite family consisting of her father, McCaulou, and mother, Katherine McCaulou. M.M. has nine other biological siblings. The first instance of abuse M.M. remembers was when she was 4 years old. McCaulou would lay M.M. in the bathtub and cover her face with a washcloth so she could not see anything. M.M. testified she did not know what was occurring but that during her "bath" her vagina would hurt and burn, and if she screamed, McCaulou would pour water over the washcloth. M.M. was afraid of water because McCaulou would throw her into ponds and canals to teach her to swim and, when she started to drown, he would pull her out, spank her, and throw her

2

back in. McCaulou's abuse of M.M. continued for years, with McCaulou inserting foreign objects into M.M.'s vagina ("pens," "hammer handles," "plunger handle," and "stuff like that") to "help [her] grow." McCaulou killed M.M.'s pets in front of her as punishment. He called M.M. "Marg" when he assaulted her because that was the name of the woman who refused to marry him. When she struggled against his abuse, McCaulou would tell M.M. to be obedient and relax because it would not hurt as much. M.M. testified that on one occasion when she refused him, McCaulou got her sister, who was a baby, and "started poking her in her privates with a straight pin" because M.M. would not "let him do it to [M.M.]." To keep McCaulou from abusing her baby sister, whom M.M. was close to and took care of, M.M. told him to stop and that she would listen to him. McCaulou then hurt M.M.

¶5      When M.M. turned 12 years old, she testified "that was the age I was old enough for him to rape me." M.M. would try to confide in her mother, but Katherine refused to believe her and told her to be quiet and go to work. When McCaulou found out M.M. had told her mother, M.M. testified he would "make it worse the next time." McCaulou also forced his penis into her mouth until she would vomit. Since the age of 12, M.M. kept a diary of these incidents, describing how she felt when her father would rape and assault her. McCaulou burned her diary upon discovering it, but M.M. kept journaling in third person as if the abuse were happening to someone else.

¶6      In 2015, the family moved to Vaughn in Cascade County where they lived in a double-wide trailer. M.M. stated that McCaulou continued to sexually assault her

3

"wherever he could find [her] alone" in places like her bedroom, the shower, the shop, or outside. M.M. explained that she would scream when McCaulou raped her, and he would respond telling her to "be quiet and imagine [she] wasn't there."

¶7 At 15 years old, M.M. became pregnant after McCaulou raped her. Upon finding out about the pregnancy, McCaulou caused M.M. to miscarry by repeatedly punching her in the stomach. After the miscarriage, McCaulou brought M.M. gifts for Mother's Day and wished her happy Mother's Day. He also began to track her menstrual cycle and use a condom for subsequent rapes.

¶8 M.M. began cutting herself because she felt she was "worthless and junk" and she "didn't want to keep on living." McCaulou noticed her cuts, so he also began to cut her inner and upper thighs with a knife. The cuts left serious scars because McCaulou usually did not wait for the cuts to heal until he cut her again. McCaulou warned M.M. that if she would tell anyone about the abuse, he would kill her siblings.

¶9 Two local ministers reported to the Cascade County Sherriff's Office (CCSO) in late September 2017 that they suspected McCaulou had sexually abused someone. Detective Blue Corneliusen opened an investigation. However, McCaulou learned that M.M. had told someone that he abused her so he arranged for M.M. to move to Pennsylvania to live with his brother, Robert, and his wife. When M.M. arrived at their home, Robert testified that he observed M.M.'s "unusual behavior." She slept often, was afraid of the dark, and had night terrors. She was unable to verbalize that McCaulou had abused her, in part because it involved topics and words forbidden in her Mennonite home

4

and because M.M. herself did not know the anatomical names for parts of the human body. Robert thus encouraged M.M. to write in her journal. It took several months before M.M. could talk to Robert and his wife about McCaulou's abuse. They encouraged her to report the abuse to law enforcement.

¶10    In February 2018, M.M. wrote to her Aunt Julie, describing her pregnancy and miscarriage. Julie contacted a counselor in a Mennonite facility in Idaho and M.M. started counseling in April 2018. M.M., now 18 years old, learned through counseling the correct anatomical names for penis and vagina and began to understand the concept of rape. In May 2018, M.M. began living with Julie and Julie's husband, Sammy, in Florida because she wanted to help Julie with her pregnancy, and because she no longer wanted to be affiliated with the strict Mennonite Church that Robert and his wife attended in Pennsylvania, fearing that she would not recover from the abuse if unable to discuss freely what had occurred. After therapy, M.M. finally felt she could talk about the years of abuse by her father.

¶11    Sammy McCaulou then contacted Detective Angel Creech from CCSO to advise that M.M. had been in therapy and was now able to talk about what happened. Detective Creech arranged for Lisa Sickels, a forensic interviewer in Florida, to interview M.M. Sickels interviewed M.M. twice. During these interviews M.M. discussed being abused and regressed into childlike behaviors, rocking back and forth in a fetal position. Sickels noted that M.M. was uncomfortable referencing genitalia, so they used anatomical drawings to depict the abuse that M.M. had experienced. Sickels explained that she had to

stop the first interview after M.M. exhibited extreme signs of stress and anxiety, which indicated to Sickels that M.M. had undergone complex trauma from physical and sexual abuse.

¶12    After M.M.'s first interview with Sickels, Dr. Cameron Rosenthal, a pediatrician and medical director of the University of Florida Child Protection Team, examined M.M. M.M. told Dr. Rosenthal that McCaulou had inserted foreign objects into her vagina since she was four years old, had penial intercourse, and caused her to miscarry his baby. Rosenthal testified that she had performed several hundred examinations of child sexual assault victims and explained that 95% of the time the exams do not reveal evidence of physical abuse. Nonetheless, Rosenthal noted scars on M.M.'s forehead and her left inner thigh that were consistent with being cut with a knife. She also described that M.M.'s injuries were "very significant, and that's representative of a traumatic event" and were not made by consensual sexual intercourse. Dr. Rosenthal, in her final report, concluded that "the medical examination supports the disclosure that [M.M.] has provided detailing the recurrent egregious abuse that she suffered by her father over many years." Dr. Rosenthal testified that M.M.'s "medical examination unequivocally supports her history of repeated episodes of significant genital and physical trauma over the course of her entire childhood."

**McCaulou's Motion in Limine**

¶13    McCaulou filed a motion in limine arguing that he should be allowed to present evidence of M.M.'s allegedly false accusations against four male relatives: her brother O.M., her uncle Joshua, her adopted uncle Daniel, and her brother V.M. M.M. told law

6

enforcement in a recorded interview that O.M., Joshua, and Daniel touched her sexually and that O.M. committed oral sex acts against her. M.M. also recorded these accusations in her diary. M.M. allegedly told V.M.'s fiancée that V.M. and McCaulou were "peeping" through M.M.'s window. The State maintained M.M.'s statements were not false, that they constituted improper evidence under the Rape Shield statute, § 45-5-511(2), MCA, and that the assaults occurred because McCaulou authorized and facilitated the sexual contact with M.M.

¶14 The District Court conducted a *Mazurek*[1] hearing wherein M.M. testified that the accusations she made during the interview were true. Defense counsel declined to cross-examine M.M. at the hearing and agreed with the court that he did not think there was any basis for him to cross examine M.M. as to the truthfulness of her accusations. V.M. testified at the hearing and confirmed M.M.'s allegation that he peeped through M.M.'s window. V.M. claimed that McCaulou did not encourage this conduct but rather admonished it. McCaulou elicited testimony from Katherine that the male relatives did not have an opportunity to be alone with M.M. and that she was not aware of any abuse committed by M.M.'s relatives.

¶15 The District Court, applying a preponderance of the evidence standard, held that the testimony did not establish that any of the accusations were false. The District Court

---

[1] *Mazurek v. Dist. Court of the Fourth Judicial Dist.*, 277 Mont. 349, 922 P.2d 474 (1996).

concluded the accusations were inadmissible under Montana's Rape Shield statute, § 45-5-511(2), MCA.

**Testimony Regarding False Reporting Statistics**

¶16   At trial, the State called Dr. Wendy Dutton as a blind expert in the field of child sexual abuse. She testified about the occurrence of false allegations in child sexual assault cases and described the nature of forensic interviews. Dr. Dutton explained that if a false report is made it could be for any number of reasons and provided, as examples, that a child is in the middle of a custody dispute; a teenager wants a change in their living situation; a child wants to remove a parent from the household due to an abusive relationship; or the child may want to hide the fact that they engaged in consensual sex. Dr. Dutton also explained that a serious mental illness may cause someone to falsely report sexual abuse.

¶17   During cross-examination of Dr. Dutton, McCaulou's counsel asked specifically what percentages of sexual abuse allegations are false:

> [Defense]: All right. And do you know what percentage of all reports are false reports according to the literature?
>
> [Dutton]: Your Honor, am I allowed to testify about that?. . .
>
> [District Court]: I'm going to let the lawyers make objections, ma'am, so if the -- you want to rephrase your question?
>
> [Defense]: Do you know what the nationwide statistic is on false report rate[s] [ ] is according to current literature?
>
> [Dutton]: Yes.
>
> [Defense]: And what is that rate?

8

[Dutton]: Again, for erroneous reports, depends if you look at the statistics from child protection services, they generally unsubstantiate about a third of the cases that they investigate. If you're considering intentional or malicious false reports, the false report rate is much lower.

[Defense]: Do you know what that rate is?

[Dutton]: It's under ten percent.

[Defense]: But it's somewhere around just under ten percent?

[Dutton]: Depends on how large the study you're talking about.

[Defense]: But in general terms, it's around that; would that be fair to say?

[Dutton]: Probably on the lower end of under ten percent.

[Defense]: Okay. So nine percent, somewhere in there?

[Dutton]: Again, with larger studies that includes a lot of cases, the intentional false allegation rate tends to be quite low. If you're looking at a smaller group of cases, then it tends more towards the eight to ten percent range.

¶18 McCaulou did not testify but presented evidence from his wife and two of their children. The jury found McCaulou guilty of incest. The verdict form asked the jury to determine: (1) whether M.M., at the time of the offense, was under 16 years of age or younger and the defendant was three or more years older than M.M. and (2) whether bodily injury was inflicted on M.M. The jury found M.M. was under 16 years of age and McCaulou was three or more years older than M.M., but did not find that McCaulou inflicted bodily injury upon M.M. McCaulou was sentenced to the Montana State Prison for a term of 110 years, with no time suspended.

**STANDARDS OF REVIEW**

¶19 While a district court has broad discretion when determining the relevancy and admissibility of evidence, it is bound by the Rules of Evidence and applicable statutes in exercising its discretion. *State v. Lake*, 2019 MT 172, ¶ 22, 396 Mont. 390, 445 P.3d 1211 (citations omitted). Where a district court's evidentiary ruling is based on its interpretation of a statute, this Court reviews the district court's ruling de novo for correctness. *Lake*, ¶ 22. Thus, a district court's decision to exclude evidence pursuant to the rape shield statute is reviewed de novo. *State v. Twardoski*, 2021 MT 179, ¶ 26 n.2, 405 Mont. 43, 491 P.3d 711.

¶20 Ineffective assistance of counsel (IAC) claims present mixed questions of law and fact and are reviewed de novo. *State v. Ward*, 2020 MT 36, ¶ 15, 399 Mont. 16, 457 P.3d 955. If the claim is based on matters outside the record, we will not review it on direct appeal, recognizing that the defendant may raise the issue in a postconviction proceeding to develop a record as to the reasons for counsel's actions. *Ward*, ¶ 20.

¶21 While our review of "issues of constitutional law" is plenary, we generally do not address constitutional issues raised for the first time on appeal, except under the plain error doctrine. *State v. Flowers*, 2018 MT 96, ¶ 12, 391 Mont. 237, 416 P.3d 180. Whether an asserted constitutional or other error of law was plain error is a question of law subject to de novo review. *Montana v. Abel*, 2021 MT 293, ¶ 4, 406 Mont. 250, 498 P.3d 199.

**DISCUSSION**

¶22  *1. Were M.M.'s allegations against her four male relatives admissible under an exception to the Montana Rape Shield statute?*

¶23  Montana's Rape Shield statute precludes evidence "concerning the sexual conduct of the victim." Section 45-5-511(2), MCA. The statute provides two narrowly drawn exceptions: (1) evidence of the victim's past sexual conduct with the offender, or (2) evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution. Neither exception is at issue here. The law is designed to prevent the trial of the charge against the defendant from becoming a trial of the victim's prior sexual conduct. *State v. Colburn*, 2016 MT 41, ¶ 22, 382 Mont. 223, 366 P.3d 258. Rape shield statutes eliminate the need for victims to defend incidents in their past and minimize the trauma of testifying. *State v. Awbery*, 2016 MT 48, ¶ 18, 382 Mont. 334, 367 P.3d 346. However, the policy of protecting against the trial becoming a trial of the victim "is not violated or circumvented if the offered evidence can be narrowed to the issue of the complaining witness' veracity." *State v. Anderson*, 211 Mont. 272, 284, 686 P.2d 193, 200 (1984). Thus, a conflict can arise between rape shield statutes and a defendant's rights to confront his accuser and to present evidence at trial in defense of the charges against him. *Colburn*, ¶ 24. Accordingly, the Rape Shield statute, § 45-5-511(2), MCA, cannot be applied to exclude evidence automatically or arbitrarily. A court must balance the interest of the defendant with those protected by the statute, requiring that the defendant's proffered evidence not be speculative or unsupported. *Colburn*, ¶ 25 ("[I]t is the trial court's responsibility to strike a balance in each case between

11

the defendant's right to present a defense and a victim's rights under the statute. A court balancing the interests of the defendant with those protected by the Rape Shield Law should require that the defendant's proffered evidence is not merely speculative or unsupported.").

¶24 When a victim alleges prior sexual assaults, "a threshold inquiry must establish both the fact of the accusations and the falsity thereof even before defense counsel launches into cross-examination." *State ex rel. Mazurek v. Dist. Court of the Mont. Fourth Judicial Dist.*, 277 Mont. 349, 359, 922 P.2d 474, 480 (1996). At a *Mazurek* hearing, the defendant must establish, by a preponderance of the evidence, that (1) the accusation(s) were "in fact made"; (2) that the accusation(s) were "in fact false"; and (3) that the evidence is more probative than prejudicial. *State v. Daffin*, 2017 MT 76, ¶ 29, 387 Mont. 154, 392 P.3d 150. The district court will only authorize cross-examination of the complaining witness concerning the alleged false accusation if the defendant satisfies all three conditions. *Daffin*, ¶ 29.

¶25 We have explained that if the victim's accusations are "true or reasonably true," then evidence of the alleged accusations is inadmissible and irrelevant to the proceeding. *State ex rel. Mazurek*, 277 Mont. at 359. The accusations must, in fact, be false based on a preponderance of the evidence before a court may authorize cross examination of the victim. For example, in *State v. Ring*, 2014 MT 49, ¶ 7, 374 Mont. 109, 321 P.3d 800, we prohibited the defendant from using alleged false accusations of sexual assault made by the victim because the only evidence defendant relied upon was a Child and Family Services report, which had not been documented in any detail and which had not been adjudicated

or admitted to be false. In *State v. Given*, 2015 MT 273, ¶ 37, 381 Mont. 115, 359 P.3d 90, we held that the defendant could not cross-examine the victim about an accusation she may have made to her counselor concerning sexual abuse by her stepfather because it was unclear whether the statement was true or false or that the victim even made such an accusation regarding prior sexual conduct.

¶26 We conclude that the District Court did not err in finding McCaulou had not demonstrated by a preponderance of the evidence that M.M.'s allegations against other male relatives were false. In fact, M.M.'s allegations were "true or reasonably true" because the State elicited uncontroverted testimony from M.M. that her male relatives had sexual contact with her. McCaulou did not present testimony that the accusations were false by calling as a witness any of the four relatives. Indeed, V.M. confirmed M.M.'s statement that he peeped through M.M.'s window. While Katherine testified on behalf of her husband that there was no opportunity for the assaults to occur, she likewise acknowledged that she did not see all her children every minute of the day and night. Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant's right to present a defense and against the victim's rights under the Rape Shield statute. The District Court evaluated the evidence in accordance with *Mazurek* and its findings that M.M.'s accusations were not false and are not clearly erroneous. Because the District Court evaluated the evidence in accordance with *Mazurek*, we will overturn its decision to exclude the prior accusations only if we find an abuse of discretion. *State v. Hoff*, 2016 MT 244, ¶ 28, 385 Mont. 85, 385 P.3d 945. On the record before us, we cannot

13

agree with McCaulou that these four accusations were established to be false, nor does the record demonstrate that the District Court exceeded the bounds of reason or acted without conscientious judgment. The accusations had no probative value and were inadmissible under the Rape Shield statute. Because McCaulou has failed to meet the threshold inquiry of demonstrating M.M.'s accusations were false, it is unnecessary to address the third *Mazurek* consideration–whether the evidence is more probative than prejudicial.[2]

¶27 *2. Was McCaulou's Sixth Amendment right to effective assistance of counsel violated when his own counsel elicited expert testimony about false reporting statistics in sexual assault cases dealing with minors?*

¶28 Credibility-boosting expert testimony regarding statistics about delayed disclosure by sexual assault victims and false reporting is improper. *State v. Grimshaw*, 2020 MT 201, ¶¶ 23-25, 401 Mont. 27, 469 P.3d 702; *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986). "It makes no meaningful difference whether [the testifying expert] couched her opinion in terms of percentages or probabilistic descriptors." *State v. Byrne*, 2021 MT 238, ¶ 27, 405 Mont. 352, 495 P.3d 440.

¶29 For IAC claims, the defendant must (1) show that "counsel's performance was deficient or fell below an objective standard of reasonableness" and (2) "establish prejudice by demonstrating that there was a reasonable probability that, but for counsel's errors, the

---

[2] McCaulou's argument that M.M.'s accusations against other male relatives were so intertwined with her accusations against McCaulou and the State's assertion that McCaulou facilitated the sexual conduct by three of the four males was not raised in the District Court. This Court has been clear that a party may not raise new arguments or change their legal theory on appeal. *State v. Strizich*, 2021 MT 306, ¶ 28, 406 Mont. 391, 499 P.3d 575. Accordingly, we will not address this theory of admissibility.

14

result of the proceeding would have been different." *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095 (adopting *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984.) To constitute ineffective assistance, counsel's conduct must flow from ignorance or neglect rather than from strategic decisions and trial tactics. *State v. Hendricks*, 2003 MT 223, ¶ 7, 317 Mont. 177, 75 P.3d 1268; *Whitlow v. State*, 2008 MT 140, ¶ 18, 343 Mont. 90, 183 P.3d 861. There is a strong presumption that counsel's performance was based on sound trial strategy and falls within a wide range of reasonable professional conduct. *Hendricks*, ¶ 7. When considering an IAC claim on direct appeal, the record on appeal must explain "why" counsel did or did not perform as alleged. *Kougl*, ¶ 14. If, as is usually the case, the claim is based on matters outside the record—such as trial strategy—we will refuse to address the issue on appeal and allow the defendant to file a postconviction proceeding so that a record as to "why" counsel acted as alleged may be developed. *Kougl*, ¶ 14.

¶30    In *State v. Rodriguez*, 2021 MT 65, ¶ 35, 403 Mont. 360, 483 P.3d 1080, the defendant argued on direct appeal that his trial counsel did not inquire about statistics of false reporting in sexual abuse cases because he misunderstood the law, and therefore, exhibited deficient performance. However, we could not determine whether counsel's actions were due to a "misunderstanding" or were merely a tactical decision. *Rodriguez*, ¶ 35. "[I]t may be a reasonable tactical decision for defense counsel to avoid eliciting statistics about false reporting of sexual assaults based on those statistics themselves, as

the expert could say that false reporting was exceedingly rare and damage the defense." *Rodriguez*, ¶ 35.

¶31 We conclude that McCaulou's IAC claim is inappropriate for review on direct appeal because the record does not answer "why" defense counsel elicited false reporting testimony from Dr. Dutton. Indeed, the record is clear that McCaulou's counsel made a purposeful decision to inquire about the false reporting statistics. Moreover, McCaulou's counsel only questioned Dr. Dutton on false reporting statistics after the State's direct examination of various scenarios surrounding false reporting. We conclude McCaulou's IAC claim on direct appeal must be denied without prejudice, because it is not record based.

¶32 *3. Should this Court exercise plain error review to consider expert testimony about false reporting statistics in sexual assault cases?*

¶33 A party who requests reversal based on plain error review "bears the burden of firmly convincing this Court that the claimed error implicates a fundamental right and that such review is necessary to prevent a manifest miscarriage of justice or that failure to review the claim may leave unsettled the question of fundamental fairness of the proceedings or may compromise the integrity of the judicial process." *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854. Moreover, we have noted that the trial court has discretion and authority to act as a "gatekeeper" to exclude "unduly prejudicial evidence." *State v. Passmore*, 2010 MT 34, ¶ 69, 355 Mont. 187, 225 P.3d 1229.

¶34 McCaulou argues that the District Court failed to sustain its gatekeeper role when it allowed defense counsel to introduce statistics that bolstered M.M.'s credibility. In response, the State contends that McCaulou fails to identify the "constitutional or other

substantial right" that would implicate plain error review. The State argues that the District Court had no obligation to stop defense counsel's line of questioning because the District Court would have had to speculate on counsel's trial strategy and potentially infringe on McCaulou's rights to present a defense. As such, the State asserts that McCaulou failed to establish that his fundamental right to due process was violated when the District Court advised the parties to lodge necessary objections.

¶35 Plain error review is unwarranted here. McCaulou does not identify a specific constitutional or substantial right that would trigger us to exercise plain error review. He only argues that the "District Court's abandonment of its gatekeeper role undermined the fundamental fairness of the proceedings." McCaulou has not demonstrated that failing to exercise plain error review may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or may compromise the integrity of the judicial process.[3] We decline to exercise plain error review to consider whether McCaulou received a fundamentally fair trial when the District Court did not sua sponte exclude testimony of false reporting statistics.

## CONCLUSION

¶36 The District Court did not err in concluding the testimony regarding M.M.'s accusations against her male relatives was inadmissible under the Rape Shield statute. McCaulou's IAC claim concerning statistical testimony about false reporting in child

---

[3] As we do not find error in these proceedings, we decline to address McCaulou's argument that the cumulative error doctrine applies.

sexual assault cases elicited by defense counsel is not appropriate to review on direct appeal. We decline to exercise plain error review to consider expert testimony of false reporting statistics.

¶37 McCaulou's conviction is affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE