DA 24-0040

FILED

06/23/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0040

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 130

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

EDMUND ALVIN ADAMS,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-22-91
Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Joseph P. Howard, Joseph P. Howard, P.C., Helena, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

      William Fulbright, Ravalli County Attorney, Angela B. Auch, Chief Deputy County Attorney, Hamilton, Montana

Submitted on Briefs: June 10, 2026

Decided: June 23, 2026

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 The State charged Edmund Alvin Adams with incest and sexual intercourse without consent after Adams's adopted daughter, R.A., disclosed that he molested her. During its investigation, the State discovered that Adams had adopted another daughter, A.P., during his prior marriage. When contacted, A.P. disclosed that Adams also sexually abused her when she was young. The District Court permitted A.P. to testify at trial over Adams's objection that her testimony was unfairly prejudicial. A Ravalli County jury found Adams guilty on all counts. We address the following restated issues:

1. *Did the District Court abuse its discretion when it permitted A.P. to testify over Adams's M. R. Evid. 403 objection?*

2. *Was Adams's trial counsel ineffective?*

We affirm Adams's conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In 2015, Adams and his wife Michele assumed custody of Michele's great-niece, R.A. Child and Family Services (CFS) had removed R.A. from her mother's care due to her mother's struggles with addiction. R.A. was approximately two and a half years old when she went to live with Michele and Adams in Stevensville, Montana. They adopted her roughly two years later.

¶3 During the time that R.A. lived with the Adamses, Michele worked four ten-hour days per week at the hospital in Hamilton and often spent her day off caring for her grandchildren in Missoula. Adams was retired but ran a laser engraving business out of

2

his shop on their property. Adams often cared for R.A. after school and during breaks while Michele was at work.

¶4 In 2022, when R.A. was nine, she confided to her friend at school that Adams was molesting her. R.A.'s friend encouraged R.A. to tell their teacher. R.A. repeated her disclosure to the school counselor and a CFS case worker, using dolls to demonstrate what Adams did to her. During a forensic interview, R.A. alleged that Adams had asked her to perform oral sex on multiple occasions, and that he also attempted vaginal, anal, and digital penetration. The State charged Adams with three counts of incest and two counts of sexual intercourse without consent.[1] The charging documents asserted that R.A. was between four and nine years old when the alleged events occurred, and Adams was between sixty-five and seventy-one years old. Adams pleaded not guilty and notified the State that he intended to assert a general denial and good character defense at trial.

¶5 During its investigation, the State discovered that Adams had adopted his biological niece A.P. during his previous marriage. When investigators reached out to her, A.P. told them that she also was sexually abused by Adams when she was young. The State obtained a warrant to conduct a search and extraction of Adams's cell phone. Adams moved in limine to exclude A.P.'s testimony and evidence of his internet search history. Adams argued that the evidence was inadmissible propensity evidence under M. R. Evid. 404(b) and, even if it was admissible, its probative value was substantially outweighed by the danger of causing unfair prejudice. The court denied Adams's motion.

---

[1] The State initially charged Adams with four counts of sexual intercourse without consent. The State amended its charges in July 2023.

3

¶6 Adams's trial took place over three days in July 2023. R.A., then ten years old, testified. She said that although living with Michele and Adams "was like living a good life," she could no longer live there because she "wasn't safe" and she had "been sexed." R.A. remembered that the first instance of sexual abuse occurred when she was four. She and Adams went outside to his shop to get ice cream, and Adams asked her to suck on his "private part." R.A. said that she did and that Adams asked her not to tell Michele. R.A. testified that this happened "a lot of times." She recalled that if she wasn't doing it right, Adams would show her a video on his phone of two adults engaged in oral sex.

¶7 R.A. recalled that Adams penetrated her "back private part" when she was seven and that once, when she and Adams were in the hot tub, he touched her private part with his hands and rubbed it inside. R.A. also testified that Adams attempted to penetrate her "front" part more than once, but that he stopped because it was painful. R.A. testified that on more than one occasion, Adams gave her R&R whiskey mixed with Pepsi. She said that Michele was not home when these events occurred. After Adams molested R.A., he often took her to Walmart in Missoula so that she could pick out a toy as a "reward or prize." R.A. identified several stuffed animals and toys that she said Adams bought for her as "rewards." R.A. remarked that Adams abused her for the last time right before she told her friend.

¶8 The State also called A.P. Adams objected under M. R. Evid 403. The court noted Adams's objection but allowed A.P. to testify. A.P. explained that her biological mother is Adams's sister. A.P. came to live with Adams and his former wife Margaret when she

4

was two or three because her biological mother was "unfit" to parent her. Adams and Margaret later adopted A.P.

¶9 A.P. alleged that Adams began abusing her when she was nine. A.P. testified that Adams would wake her up in the middle of the night to take a bath in the master bathroom. She recalled that Adams gave her little white bottles that she later learned contained whiskey, and that he told her to "shoot them down like a shot so you don't even taste them." A.P. testified that Adams forced her to engage in oral, vaginal, and anal sex and that Adams would sometimes give her gifts afterwards such as money or earrings. Because Margaret was a night shift nurse in a nearby town and often spent nights away from home, she was not home when the alleged abuse occurred.

¶10 A.P. testified that Adams stopped abusing her just before she turned fourteen and apologized to her when she was fifteen. She said that she forgave him because he sounded disgusted by his actions but that his conduct was still inexcusable. She eventually disclosed the abuse to Margaret after she and Adams divorced, and Margaret filed a report with the sheriff's office. A.P. chose not to press charges, remarking that she "chose to leave it up to God's judgment." A.P. testified that she does not know R.A. but testified because she wanted to "protect" and "be a voice for someone else." A.P.'s abuse ended approximately twenty-four years before Adams began abusing R.A.[2]

---

[2] Although the record does not provide the dates of A.P.'s alleged abuse, A.P. testified that Adams abused her from the ages of nine to thirteen and apologized to her when she was fifteen in 1996. The parties therefore estimate that A.P.'s alleged abuse occurred approximately twenty-eight to thirty-three years prior to the trial, which occurred roughly six years after Adams first abused R.A.

5

¶11     The State also called law enforcement personnel, a CFS worker, and child advocacy workers who were involved in R.A.'s case. Deputy Emily Hachenberger testified that she reviewed the internet search data obtained from Adams's phone and organized it into four categories: (1) general searches, (2) incestuous searches, (3) underage searches, and (4) informational searches. The general category included searches Adams might research for his business or church. The incestuous searches were factually consistent with R.A.'s disclosure, the underage searches were factually consistent but not incestuous in nature, and the informational searches suggested that Adams was searching for information consistent with the assaults R.A. would later describe. Hachenberger listed several examples from each category. The State offered, and the court admitted, the cell phone search data into evidence as Exhibit 31. Adams renewed his objection to this evidence under Rule 403, but the court overruled it.

¶12     After the State rested, Adams presented his defense. Adams called Dr. Cara Laney, a psychology professor, who testified that it is possible for individuals to have false memories that they confidently believe in. She said that it was possible R.A.'s memory was "corrupted" when she spoke with her friend or the school counselor. Laney also testified that a person's exposure to drugs may affect their memory. Several of Adams's friends and family members—including Michele—testified that Adams was a good person and that they believed he was telling the truth. Michele remarked that she had never observed any physical signs of abuse on R.A.'s body or noticed anything out of the ordinary in their home.

¶13     Prior to closing arguments, the District Court read Instruction 21 to the jury:

The State has offered evidence that Edmund Adams engaged in other wrongs or acts at another time. That evidence is not admitted to prove the character of Edmund Adams or to show he acted in conformity with alleged prior behavior. The only purpose of admitting that evidence is to show proof of motive, common scheme and/or intent. You may not use this evidence for any other purpose. Edmund Adams is not being tried for that other wrong or act. He may not be convicted for any other wrong or offense aside from the charges at issue in this case. You may not use any evidence of other wrongs to prove that he has a propensity to commit the offenses charged. For the jury to convict Edmund Adams of any other offense than that charged in this case may result in unjust double punishment of Edmund Adams.

Both parties referenced Instruction 21 in their argument, cautioning the jury that it could consider A.P.'s testimony and the search history evidence only for the limited purposes set forth in the instruction. The jury found Adams guilty on all counts, and the court sentenced him to five consecutive 100-year prison terms.

## STANDARD OF REVIEW

¶14 "District courts have broad discretion to determine the admissibility of evidence." *State v. Daffin*, 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150 (citations omitted). We review a court's evidentiary rulings for an abuse of discretion, "which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142 (citing *State v. Spottedbear*, 2016 MT 243, ¶ 9, 385 Mont. 68, 380 P.3d 810). We review de novo a defendant's record-based ineffective assistance of counsel claims. *State v. Aker*, 2013 MT 253, ¶ 22, 371 Mont. 491, 310 P.3d 506.

## DISCUSSION

¶15 *1. Did the District Court abuse its discretion when it permitted A.P. to testify over Adams's M. R. Evid. 403 objection?*

7

¶16    M. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Although relevant evidence is generally admissible, M. R. Evid. 402, parties may not introduce evidence of a person's prior bad acts to prove "the character of a person in order to show action in conformity therewith," M. R. Evid. 404(b). The danger of admitting such evidence is that the jury might "prejudge" the accused and deny them a fair opportunity to defend themselves. *State v. Peterson*, 2024 MT 5, ¶ 14, 415 Mont. 34, 541 P.3d 776 (citations omitted). Evidence of a person's prior bad acts may be admissible for other purposes, however, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). Adams does not challenge the relevance of A.P.'s testimony or its admissibility under Rule 404(b).

¶17    But even if prior bad acts evidence is admissible, the court may exclude the evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403; *Peterson*, ¶ 21. Rule 403's balancing test favors admission. *Peterson*, ¶ 21.

¶18    In his motion in limine, Adams argued that A.P.'s testimony created a significant risk of unfair prejudice because "if [A.P.] presents as credible, the jury will be more likely to convict Mr. Adams based on her testimony . . . regardless of the veracity or credibility of the complaining witness." The State responded that A.P.'s testimony was relevant and admissible under Rule 404(b) to prove Adams's motive, his intent, and his preparation or

8

plan to abuse R.A. The State argued that the probative value of A.P.'s testimony "is simply more substantial tha[n] any risk of unfair prejudice to [Adams] by its admission." The District Court agreed with the State and denied Adams's motion. The court remarked:

> Distasteful evidence is not automatically prejudicial and the nature of the charges in this case necessitates evidence of negative behaviors. The State describes a pattern of behavior by Defendant that would be shown by [A.P.'s] testimony, which is the same pattern of behavior alleged in this case. This pattern ties the past and present evidence together through the lens of a common, non-propensity motive that is specific to these instances of alleged sexual abuse, which are particular in their nature: rape of an adopted daughter.

¶19 Adams argues on appeal that the District Court's Rule 403 balancing of A.P.'s testimony was erroneous.[3] Adams contends that because A.P.'s alleged abuse occurred approximately thirty years before trial, her allegations are too remote in time to have significant probative value. The State responds that A.P.'s testimony is highly probative given the similarities between her and R.A.'s allegations, and that the probative value of these similarities outweighs any danger of unfair prejudice to Adams.

**Probative Value of A.P.'s Testimony**

¶20 The District Court determined that A.P.'s testimony was admissible under Rule 404(b) and probative of Adams's motive, his criminal intent, and his preparation or plan. This Court has affirmed the State's use of prior acts evidence for the same purposes in other sex abuse cases. *See, e.g.*, *Daffin*, ¶¶ 19-20 (concluding that former victims' testimony "demonstrated Daffin's longstanding fixation with underage teen girls,

---

[3] Adams does not challenge the District Court's denial of his motion in limine with respect to his internet search history.

9

particularly living in vulnerable family situations, and provided the motive for his crimes"); *Peterson*, ¶¶ 19-20 (explaining that because Peterson generally denied that the sexual assault occurred, the prior acts evidence was admissible to prove Peterson's criminal intent); *Madplume*, ¶ 29 (concluding that prior uncharged sexual abuse attempt was sufficiently similar to the charged offense to prove that defendant acted with a common plan).

¶21 Adams contends that A.P.'s allegations lacked probative value because her alleged abuse occurred decades before trial. We do not apply a bright-line rule to determine whether remoteness in time diminishes the probative value of other acts evidence; instead, remoteness generally pertains "only to the weight of evidence rather than its admissibility." *State v. Pelletier*, 2020 MT 249, ¶ 25, 401 Mont. 454, 473 P.3d 991 (citations omitted). Whether the evidence must be excluded because it is too remote depends on "the nature of the evidence and the purpose offered." *Pelletier*, ¶ 25 (citations omitted); *see also State v. Stout*, 2010 MT 137, ¶ 101, 356 Mont. 468, 237 P.3d 37 (Nelson, J., dissenting) ("[W]hether an uncharged act is truly too remote in time will depend on the particular purpose for which the evidence is offered and the proponent's theory of logical relevance . . . .").

¶22 We applied these principles in *Pelletier* to conclude that the district court improperly permitted the State to cross-examine Pelletier about an uncharged sexual abuse allegation that occurred approximately fifteen years prior to trial. *Pelletier*, ¶¶ 9-10, 28. The State offered the prior allegation for the purpose of rebutting Pelletier's testimony that he was not the type of person to commit a sexual offense. *Pelletier*, ¶¶ 9-10; M. R. Evid. 404(a)(1)

10

(providing that when a defendant offers evidence of their good character, the prosecution may offer rebuttal evidence). We determined that the allegation had limited probative value for the purpose offered because (1) the truth of the allegation was unknown and (2) the prior incident occurred when Pelletier "was a 15-year-old adolescent rather than the mature 30-year-old adult he was at the time of the charged incident in 2018." *Pelletier*, ¶¶ 24-25. The timeliness and truth of the allegation were important considerations to determining its probative value for the offered purpose—to rebut Pelletier's "self-serving good character testimony" under M. R. Evid. 404(a)(1). *Pelletier*, ¶¶ 24-26. In addition to the allegation being unsubstantiated, "the significant difference in maturity level" between a fifteen-year-old and a thirty-year-old diminished the evidence's probative value for purposes of proving Pelletier's character at the time of trial. *Pelletier*, ¶ 25. On balance, we concluded that the risk of unfair prejudice outweighed the limited probative value of the evidence under Rule 403. *Pelletier*, ¶ 28.

¶23 In *State v. Given*, 2015 MT 273, 381 Mont. 115, 359 P.3d 90, however, we affirmed the court's ruling permitting Given's sister to testify that Given sexually abused her eighteen years prior to his trial for the abuse of K.F. The district court prohibited the State from introducing evidence of Given's conviction for abusing his sister but permitted the sister to testify about the abuse to prove Given's intent, absence of mistake, and common scheme of grooming used to perpetrate the abuse of K.F. *Given*, ¶ 25. Noting the similarities between Given's sister's and K.F.'s allegations, we reasoned that her testimony was relevant and probative for the non-propensity purposes offered despite the remoteness of the allegations. *Given*, ¶ 31 ("[B]oth incidents involved young children with whose care

11

Given had been entrusted and . . . in both cases, Given had given special favors and generous gifts to the victims far in excess of what he did for their siblings."). We concluded that the court did not abuse its discretion when it concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *Given*, ¶¶ 33-34.

¶24 Like *Given*, there are substantial similarities between A.P. and R.A.'s allegations. Adams adopted both girls after their mothers no longer could care for them. Adams began abusing them when they were young and allegedly forced them to engage in oral, vaginal, and anal sex—sometimes intoxicating them with whiskey first. In both cases, Adams's wives worked long hours outside of the home, and Adams allegedly seized this opportunity to carry out the abuse. Both A.P. and R.A. testified that Adams gave them gifts after he molested them. Unlike Pelletier, Adams was a mature adult when he allegedly abused both A.P. and R.A. In *Pelletier*, the State offered the fifteen-year-old allegation to prove Pelletier's character *at the time of trial*; thus, the timeliness of the allegation was important to the State's theory of logical relevance. *Pelletier*, ¶ 25. Here, the State offered A.P.'s testimony to prove Adams's motive, intent, and preparation or plan to abuse R.A. Like in *Given*, timeliness was less important to the State's theories of logical relevance.[4]

---

[4] The Dissent, ¶¶ 53-54, relies on *State v. Tecca*, 220 Mont. 168, 714 P.2d 136 (1986), and *State v. Ray*, 267 Mont. 128, 882 P.2d 1013 (1994), to argue that the probative value of A.P.'s allegations was substantially diminished because there was no continuous pattern of conduct between A.P.'s and R.A.'s abuse. *Tecca* and *Ray* discuss remoteness in the context of this Court's outdated Rule 404(b) framework, which required that prior acts "must not be remote in time" to be admissible. *Ray*, 267 Mont. at 132, 882 P.2d at 1015. We overruled this requirement in *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, 358 Mont. 325, 246 P.3d 415 (*Salvagni*), explaining that the remoteness bar to admissibility was a holdover "from our pre-Rule 404(b) jurisprudence and [is] not necessarily applicable to every nonpropensity theory of logical relevance." *Salvagni*, ¶ 56.

12

¶25    The Dissent cites *Given* and *Pelletier* to argue that A.P.'s testimony carries less probative force because A.P.'s allegations were unadjudicated.  Dissent, ¶¶ 57-60.  Again, depending on the purpose for which the evidence is offered, the adjudicated truth of prior bad acts evidence may be one consideration in a Rule 403 analysis.  *See Pelletier*, ¶ 24 ("[T]he unsubstantiated 2003 allegation thus had no non-speculative probative value for the offered purpose of rebutting [Pelletier's] asserted good character.").  Although the Dissent distinguishes *Given* on this ground, our analysis of the prior acts evidence in that case did not hinge on—or even discuss—Given's conviction.  The jury there faced the same task that the Dissent, ¶ 60, notes in this case: because the court did not permit evidence of Given's prior conviction, the jury had to determine his sister's credibility and whether to accept her testimony.  *Given*, ¶ 25.  Like remoteness, the State's theory of logical relevance informs whether the evidence's probative value is diminished by the absence of a conviction.

¶26    Here, A.P.'s testimony tended to prove that Adams's motive to abuse R.A. was his sexual fixation with underage girls in a familial relationship—his adopted daughters— whose care had been entrusted to him.  Because Adams asserted a general denial defense, the State had to prove that Adams "knowingly" committed the offenses of incest and sexual intercourse without consent.  Sections 45-5-503, -507, MCA.  Adams's defense at trial was that R.A.'s memory may have been "false" or that the events she described did not occur.  In support of his defense, Adams presented expert testimony that R.A.'s memory may have

---

*Tecca* and *Ray* thus analyzed remoteness within a rigid framework that our current approach does not apply.

13

been "corrupted" by third parties who implanted false memories about the abuse. Adams also called several friends and family members—including R.A.'s adoptive mother—who testified that they never observed any signs of abuse in R.A., that Adams was a good person, and that they believed he was telling the truth. A.P.'s testimony undermined the defense's theory and tended to disprove that R.A. made up the allegations. The similarities between A.P.'s and R.A.'s allegations were probative of Adams's common scheme or plan to take advantage of a child brought into his home from an unstable family situation, groom her using specific techniques, and abuse her while his wife was at work.

¶27 Viewing the record as a whole, A.P.'s testimony carries added probative value considering Adams's defense attacking the veracity of R.A.'s claims. We do not, as the Dissent claims, suggest that similarity is "self-justifying." Dissent, ¶ 63. In this case, however, the similarities between A.P.'s and R.A.'s allegations were highly probative of the specific, non-propensity purposes for which they were offered. The Dissent fails to afford appropriate deference to the District Court's evaluation of these similarities in light of Adams's specific defense theory when analyzing the evidence's probative value. Though a great deal of time had passed since his abuse of A.P., Adams's abuse of R.A. seemingly occurred at his next opportunity.

**Danger of Unfair Prejudice**

¶28 Adams maintains that the unfairly prejudicial nature of A.P.'s testimony tips the Rule 403 balancing toward inadmissibility. Because probative evidence inherently is prejudicial to one side or the other, Rule 403 bars evidence only if it poses a "danger of *unfair* prejudice." *Peterson*, ¶ 21 (quoting *State v. Lake*, 2022 MT 28, ¶ 32, 407 Mont.

14

350, 50 P.3d 274). Evidence is unfairly prejudicial when it is likely to provoke the jury to decide the case on an improper basis, *Given*, ¶ 33, such as when it is likely to: "(1) provoke jury hostility or sympathy for one side regardless of probative value; (2) unduly confuse, mislead, or distract the jury from the central matters at issue in the case; or (3) cause the jury to give undue importance or emphasis to an extraneous prejudicial matter," *Pelletier*, ¶ 21 (citations omitted). If the prior acts evidence is both highly relevant and inherently prejudicial, courts can reduce or eliminate the risk of unfair prejudice by providing a limiting instruction. *Pelletier*, ¶ 27.

¶29 Recognizing the "highly inflammatory nature of child sex abuse evidence," *Peterson*, ¶ 22, we have considered whether the uncharged act is "more abhorrent" than the crime charged. *See Peterson*, ¶ 23; *State v. Murphy*, 2021 MT 268, ¶ 16, 406 Mont. 42, 497 P.3d 263. If so, the evidence may be more likely to provoke the jury to decide the case on an improper basis. *See, e.g., Peterson*, ¶¶ 2, 23 (concluding that extensive evidence of prior rape and digital penetration allegations against Peterson posed risk of unfair prejudice in his trial for sexual assault for allegedly touching granddaughter's vagina over her pants). A.P.'s allegations, in contrast to *Peterson*, were quite similar to R.A.'s, not "more abhorrent," *Peterson*, ¶ 23, and would not have a tendency to distract the jury from the acts with which Adams was charged. The two testified that Adams had forced them to perform similar sexual acts, thus reducing the likelihood of inflammatory impact from A.P.'s testimony or provoking jury hostility "regardless of probative value." *Pelletier*, ¶ 21.

¶30 The Dissent, ¶ 67, suggests that prior acts that are too similar render the evidence too prejudicial. But as we recognized in *Given*, ¶ 33, Rule 403 "does not require the exclusion of relevant evidence simply because it is prejudicial. Rather, such evidence is inadmissible only when it will prompt the jury to decide the case on an improper basis." In *Given*, like here, the similarities between the two instances of sexual abuse were pronounced, but we did not find the evidence unfair. *Given*, ¶ 33. We reach the same conclusion in this case. As discussed, Rule 403 favors admission of evidence. *Peterson*, ¶ 21. And the balancing it calls for is committed to the discretion of the trial court, not to de novo determination on appeal. *State v. Colburn*, 2018 MT 141, ¶ 17, 391 Mont. 449, 419 P.3d 1196. Although A.P.'s testimony was inherently prejudicial, the District Court did not act arbitrarily or without conscientious judgment when it concluded that the evidence did not pose a significant risk of *unfair* prejudice that would *substantially outweigh* its high probative value. M. R. Evid. 403.

¶31 Adams contends, though, that the State's use of A.P.'s testimony amplified its prejudicial nature. "Evidence of a defendant's prior bad conduct may amplify its inherently prejudicial nature by virtue of the manner in which it is presented and used." *Peterson*, ¶ 24. For example, in *Peterson*, the State's use of the prior acts evidence violated Rule 403 because the State repeatedly reminded the jury of Peterson's prior offenses and emphasized that Peterson had not been "brought to justice for the vast majority of his conduct." *Peterson*, ¶ 25. Despite testimony from three witnesses that Peterson sexually abused them as children, the State presented evidence that Peterson had been convicted only once and served just forty-five days in jail. *Peterson*, ¶¶ 25-26. We determined that the State's use

16

of the evidence created a risk that the jury would convict Peterson because he had "gotten away with" his prior offenses or "had not learned his lesson." *Peterson*, ¶ 26 (internal quotations omitted; citations omitted).

¶32 In Adams's trial, the prosecutor asked A.P. about the general categories of sexual activity that she engaged in with Adams but cautioned, "I don't want detail." R.A., on the other hand, vividly described the sexual acts that Adams forced her to perform and the pain that his actions caused her. Further, the court gave a Rule 404(b) limiting instruction, directing the jury not to use the prior acts evidence for any purpose other than to show "proof of motive, common scheme and/or intent." The State emphasized the court's limiting instruction during closing, stating, "The jury does not get to listen to [A.P] and think, [w]ell, if he's done it before, he must've done it this time . . . . We're deciding [R.A.'s] case today. But what the jury can do is, again, say, [w]hat motivates the defendant, and was this a part of his preparation or plan?" Although A.P. testified that she did not press charges against Adams and that she wanted to help R.A., the State did not belabor this aspect of her testimony to argue that Adams had gone unpunished in the past. Because A.P.'s testimony was both highly relevant and prejudicial, the court's instruction reduced the risk that the evidence would unfairly prejudice Adams. *Pelletier*, ¶ 27. The record does not support Adams's argument that the State improperly amplified the prejudicial nature of A.P.'s testimony.

¶33 The Dissent claims that the risk of unfair prejudice was heightened by the State's introduction of Adams's search history evidence and the court's failure to provide a second limiting instruction immediately preceding A.P.'s testimony. Dissent, ¶¶ 69-71. Adams

17

does not challenge on appeal the court's admission of his search history evidence—either under Rule 404(b) or under Rule 403. Nor did he request a second limiting instruction before A.P. testified. *See Salvagni*, ¶ 49. We do not consider in our Rule 403 analysis the admission of evidence Adams did not challenge on appeal.

¶34 District courts are in the best position to evaluate the prejudicial effect of evidence and are afforded broad discretion in determining its admissibility. *Peterson*, ¶ 21. The District Court considered the inherently prejudicial nature of A.P.'s testimony but determined that, given the similarities between R.A.'s and A.P.'s allegations, the probative value of A.P.'s testimony outweighed any risk of unfair prejudice to Adams. The Dissent fails to give the court the deference that the applicable standard of review requires. Under the abuse of discretion standard, we do not substitute our view for that of the trial court but determine whether the court "acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, resulting in substantial injustice." *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45. Considering the above factors in light of pertinent precedent, we conclude that the District Court did not abuse its discretion by admitting A.P.'s testimony.

¶35 *2. Did Adams receive ineffective assistance of counsel?*

¶36 Defendants have a constitutional right to effective assistance of counsel. Mont. Const. art. II, § 24; U.S. Const. amend. VI. To succeed on an ineffective assistance of counsel claim, "a defendant must prove both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *State v. Ward*, 2020 MT 36, ¶ 18, 399 Mont. 16, 457 P.3d 955 (citations omitted). To establish prejudice, a

18

defendant must prove "a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Spottedbear*, ¶ 49 (quoting *State v. Johnston*, 2010 MT 152, ¶ 15, 357 Mont. 46, 237 P.3d 70).

¶37   We generally review an ineffective assistance claim on direct appeal only when counsel's reasoning for taking a particular course of action is apparent from the face of the record. *State v. West*, 2026 MT 13, ¶ 44, 426 Mont. 139, 583 P.3d 205.  Claims based on matters outside the record are better suited for postconviction proceedings. *Ward*, ¶ 20.  In the rare case that "no plausible justification" exists for counsel's decision or when "counsel is faced with an obligatory, and therefore non-tactical, action," we will review a defendant's claim regardless of whether it is record based. *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095 (citations omitted).

¶38   Adams argues on appeal that his trial counsel was ineffective because she failed to request that the court give a limiting instruction before A.P. testified or before the State introduced evidence of Adams's search history.  Adams contends that, when admitting prior acts evidence under Rule 404(b), courts must provide a limiting instruction twice during trial: once before the evidence is introduced and again prior to closing argument.  He claims that there was no plausible justification for counsel's omission and that, in the absence of a second limiting instruction, he was prejudiced and deprived of a fair trial.

¶39   Adams relies on this Court's outdated procedural framework for the admission of Rule 404(b) evidence to support his argument. *See State v. Just*, 184 Mont. 262, 274, 602 P.2d 957, 964 (1979) (requiring courts to explain to the jury the purpose of Rule 404(b) evidence and "admonish it to weigh the evidence only for such purposes"), *overruled by*

19

*Salvagni.* After *Salvagni*, the burden falls on defendants to propose an appropriate limiting instruction if desired. *Salvagni*, ¶ 49. There, we remarked that if a court deems Rule 404(b) evidence admissible, the defendant *may* request a limiting instruction. *Salvagni*, ¶ 49 (emphasis added). This is consistent with M. R. Evid. 105, which provides that when evidence is admissible for one purpose but not for another, "the court, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) Adams's argument that his trial counsel was obligated to request a limiting instruction both as part of the trial instructions and prior to the State's introduction of Rule 404(b) evidence is without support. Further, there exists at least a plausible justification for counsel's failure to do so, including avoiding drawing extra attention to the evidence.

¶40 The record does not support Adams's argument that he was prejudiced by counsel's omission. Adams's attorney proposed, and the court gave, a limiting instruction directing the jury not to consider the prior acts evidence for propensity purposes. During closing argument, Adams's counsel cautioned jurors not to use A.P.'s testimony and the "pornography searches" to assume his guilt. She emphasized that "[t]hose facts, if believed, only go to the limited purpose which the instruction will tell you. And that is intent, motive, and common scheme." The State gave a similar warning during its argument and did not improperly emphasize the prior acts evidence. We therefore conclude that Adams cannot meet his burden of proving that, but for counsel's failure to request that the instruction be given twice, there exists a "reasonable probability" that the outcome of his trial would have been different. *Spottedbear*, ¶ 49.

## CONCLUSION

¶41 The District Court did not act arbitrarily or exceed the bounds of reason when it concluded that the probative value of A.P.'s testimony was not substantially outweighed by the danger of unfair prejudice. The District Court therefore did not abuse its discretion when it permitted A.P. to testify over Adams's Rule 403 objection. Adams has not met his burden to show that his trial counsel was ineffective. We affirm Adams's conviction.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice Katherine M. Bidegaray, dissenting.

¶42 I respectfully dissent. The majority affirms the admission of highly inflammatory other-acts evidence that was extraordinarily remote, never charged, never adjudicated, never admitted by Adams, and introduced in a case that depended heavily on credibility. I agree the evidence had some non-propensity value because the State identified permissible Rule 404(b) purposes and the similarities between the two sets of allegations were real. But Rule 404(b) admissibility does not end the analysis. The central question is whether, under M. R. Evid. 403, that probative value was substantially outweighed by the danger that the jury would use a decades-old, uncharged, unadjudicated allegation for the forbidden propensity inference. In my view, the majority gives controlling practical weight to similarity while giving insufficient force to remoteness, lack of continuity, uncertainty

21

of the prior allegation, and the practical risk that the jury would treat the prior allegation as direct corroboration of the charged allegation. Similarity may increase probative value, but it also increases the danger that jurors will reason: if he did it to one adopted daughter, he likely did it to another. Rule 403 requires courts to confront both sides of that equation. Because the District Court abused its discretion under M. R. Evid. 403, and because the error was not harmless, I would reverse and remand for a new trial.

## I. Procedural posture and relevant facts

¶43 The State charged Edmund Alvin Adams with three counts of incest and two counts of sexual intercourse without consent based on allegations by his adopted daughter, R.A., arising between 2016 and 2022, when R.A. was between four and nine years old. Before trial, Adams moved in limine to exclude testimony from A.P., another adopted daughter, concerning allegations that Adams sexually abused her approximately 28 to 33 years earlier. The District Court denied the motion, concluding the evidence was admissible for non-propensity purposes under M. R. Evid. 404(b) and that its probative value was not substantially outweighed by unfair prejudice under M. R. Evid. 403.

¶44 At trial, R.A. testified that Adams began sexually abusing her when she was four and described abuse that occurred when Michele was away or not home. The State also introduced Adams's Internet search history, which included numerous incestuous and underage sexual search terms. Adams does not challenge on appeal the admission of that search-history evidence. I therefore do not rely on its admission as error. The search-history evidence matters only to the evidentiary landscape and harmless-error

22

analysis because it gave the State independent evidence of Adams's sexual interests and knowledge; it did not make A.P.'s testimony any less prejudicial or merely cumulative.

¶45 Near the end of the State's case, A.P. testified that Adams began abusing her when she was nine and continued until she was nearly fourteen; that he used alcohol, gifts, and the absence of his then-wife to facilitate the abuse; and that he later apologized. A.P. further testified that she never pursued charges. Her allegations were never charged, never adjudicated, and never admitted by Adams.

¶46 The jury did not receive the limiting instruction before hearing either the search-history evidence or A.P.'s testimony. The court delivered the instruction only as part of the final charge. I do not treat the absence of a contemporaneous limiting instruction as an independent ground for reversal. M. R. Evid. 105 is request-based, and Adams did not request such an instruction before A.P. testified. But the timing of the instruction remains relevant to the majority's reliance on that instruction to reduce the prejudice from the evidence. The jury convicted Adams on all counts.

## II.  Standard of review

¶47 We review evidentiary rulings for abuse of discretion. *State v. Daffin*, 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150. A district court abuses its discretion when it acts arbitrarily, without conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142.

¶48 Evidence of other crimes, wrongs, or acts is not admissible to prove character in order to show action in conformity therewith. M. R. Evid. 404(b). Such evidence may be admissible for other purposes, including proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident.  M. R. Evid. 404(b).  But Rule 404(b) admissibility does not end the analysis.  Even when other-acts evidence is relevant for a permissible purpose under Rule 404(b), it remains subject to exclusion under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Peterson*, 2024 MT 5, ¶ 21, 415 Mont. 34, 541 P.3d 776.  Remoteness bears directly on probative value, should be considered in a Rule 403 analysis, and, depending on the nature of the evidence and the purpose offered, may substantially diminish it.  *State v. Dist. Ct. of the Eighteenth Jud. Dist.*, 2010 MT 263, ¶ 56, 358 Mont. 325, 246 P.3d 415 (*Salvagni*); *State v. Pelletier*, 2020 MT 249, ¶ 25, 401 Mont. 454, 473 P.3d 991.

¶49     *Salvagni* eliminated the former modified-*Just* framework and rejected a categorical remoteness bar; it did not make remoteness irrelevant.  Remoteness remains important because it bears directly on whether other-acts evidence retains meaningful non-propensity probative value for the purpose offered.  *Salvagni*, ¶ 56; *Pelletier*, ¶ 25.  *Salvagni* therefore does not end the inquiry; it moves the inquiry where the Rules of Evidence place it—into the Rule 403 balance.

¶50     If the evidence was admitted in error, the State must show that the quality of the tainted evidence was such that there is no reasonable possibility the tainted evidence contributed to the conviction.  *State v. Van Kirk*, 2001 MT 184, ¶ 44, 306 Mont. 215, 32 P.3d 735.

## III.  The District Court abused its discretion under Rule 403

¶51     I agree with the Court to this extent:  A.P.'s testimony was not irrelevant merely because it concerned prior conduct.  The State articulated non-propensity theories—

24

motive, intent, preparation, and plan—and the similarities between A.P.'s and R.A.'s allegations were real. Those similarities gave the evidence some probative value. But Rule 403 is the operative limit, and it required exclusion here because the danger of unfair prejudice substantially outweighed that value.

¶52 The State offered A.P.'s testimony to prove motive, intent, preparation, plan, and knowledge—specifically, that Adams had a sexual fixation on young, adopted daughters; that his alleged conduct toward R.A. was knowing rather than innocent, innocuous, or accidental; and that he had a plan or preparation to adopt a vulnerable child, groom her, and sexually abuse her. Those are permissible Rule 404(b) purposes. But Rule 403 requires more than labels. It requires the court to test whether the evidence has substantial non-propensity probative value for the stated purpose and whether that value is substantially outweighed by the risk that the jury will use the evidence for the forbidden inference. Here, the State's stated "motive" theory—that Adams had a sexual fixation on adopted daughters—came especially close to the prohibited propensity inference that, because he allegedly abused one adopted daughter decades earlier, he likely abused another.

## A. Extreme remoteness sharply reduced the evidence's probative value

¶53 Montana law does not treat remoteness as an afterthought. Although *Salvagni* rejected a categorical remoteness bar, it preserved remoteness. Remoteness remains as a Rule 403 consideration because remoteness bears directly on whether other-acts evidence retains meaningful non-propensity probative value for the purpose offered. Pre-*Salvagni* cases do not control the admissibility inquiry, but they remain instructive examples of a

25

common-sense Rule 403 principle: remoteness matters less when the State shows continuity, and more when the prior allegation is isolated and separated from the charged conduct by decades. In *Ray*, this Court held that prior acts occurring 16 to 18 years before the charged conduct were too remote absent intervening acts showing a continuing course of conduct. *State v. Ray*, 267 Mont. 128, 133-34, 882 P.2d 1013, 1016 (1994). In *Tecca*, by contrast, remoteness was alleviated because the State established a continuing pattern of similar conduct extending over the nine years leading up to the charged offense. *State v. Tecca*, 220 Mont. 168, 172-73, 714 P.2d 136, 138-39 (1986). *Ray* and *Tecca* do not impose a post-*Salvagni* remoteness bar. They illustrate why continuity matters when the State asks a jury to use old conduct to infer present motive, intent, or plan. *Pelletier* confirms the same principle under the modern framework: depending on the nature of the evidence and the purpose for which it is offered, remoteness may substantially diminish probative value on Rule 403 balancing. *Pelletier*, ¶ 25.

¶54 This case is not *Tecca*. Here, the State presented no bridging conduct, no intervening allegations, and no continuous pattern spanning the decades between A.P.'s allegations and the charged conduct involving R.A. Instead, it offered two isolated sets of allegations separated by roughly three decades. Under *Salvagni*, *Ray* and *Pelletier*, that temporal gulf matters greatly.

¶55 The majority's response is that the abuse of R.A. occurred at Adams's "next opportunity." But the "next opportunity" rationale supplies by inference what the record lacks in proof: continuity. "Next opportunity" is not a fact found in the record; it is an inference drawn from the absence of another young, adopted daughter in Adams's home.

26

That inference may explain why the State sought the evidence, but it cannot itself supply the continuity missing from the Rule 403 analysis. If a decades-long gap can be filled simply by characterizing the charged conduct as the defendant's next opportunity, remoteness ceases to have independent force in any case involving an older defendant accused of similar misconduct after a long interval. Rule 403 balancing cannot be sustained by conjecture. The question is not whether one can imagine a theory that restores probative value, but whether the State established enough real probative force to justify the substantial danger of unfair prejudice. On this record, it did not.

¶56 On this record, "next opportunity" is not evidence of continuity; it is a label placed on a gap. The State did not prove intervening conduct, intervening allegations, or a continuing pattern over the decades between the two sets of allegations. A court cannot restore probative force lost to remoteness by assuming that a defendant would have reoffended earlier had a similar opportunity arisen. That assumption approaches the propensity inference Rule 404(b) forbids and Rule 403 must guard against.

**B. The prior allegation was uncharged, unadjudicated, and uncertain in a way that further reduced probative value**

¶57 The distinction between this case and *Given* is critical. In *State v. Given*, 2015 MT 273, 381 Mont. 115, 359 P.3d 90, this Court affirmed the admission of other-acts testimony concerning a sexual assault that occurred eighteen years before the charged sexual assault of a 10-year-old boy, K.F. But *Given* is materially distinguishable. There, Given had admitted sexually assaulting his sister when she was between six and eleven years old and had been convicted of that offense. *Given*, ¶ 6. In determining whether to allow Given's

27

sister to testify in K.F.'s case, the District Court followed the process articulated in *Salvagni*, ¶ 49. The District Court limited the purpose for which the jury could consider the evidence, allowing Given's sister's testimony only to show intent and absence of mistake after Given claimed his conduct toward K.F. was accidental or harmless. *Given*, ¶ 25. And before the sister testified, the court instructed the jury on the limited purpose of the testimony. *Given*, ¶ 25.

¶58 The majority correctly notes that the jury in *Given* did not hear evidence of the prior conviction and therefore still had to assess the sister's credibility. But that does not make the conviction irrelevant to the Rule 403 context. *Given*'s significance is not that the jury heard about the prior conviction; it did not. Its significance is that the prior act was not an untested, decades-old allegation at the admissibility stage. Given had admitted and been convicted of the prior assault. The prior conviction materially reduced the uncertainty and collateral-litigation concerns that dominate the Rule 403 balance here. *Given* also involved a narrower purpose tied to intent and absence of mistake, and the jury received a limiting instruction before hearing the sister's testimony of the prior act. *Given,* ¶ 25. Those safeguards materially affected the Rule 403 balance.

¶59 Ordinary deference to the District Court's Rule 403 judgment does not answer the problem. Deference is warranted when the trial court exercises discretion on a record that permits it to assign probative value without relying on the forbidden propensity inference. That was true in *Given*. The prior act had been admitted and adjudicated, the evidence was confined to narrower purposes tied to intent and absence of mistake, and the jury received limiting guidance before hearing the testimony. *Given*, ¶¶ 6, 25. Those circumstances

28

provided a more reliable basis for assigning probative value while limiting collateral prejudice. Here, by contrast, the District Court's Rule 403 analysis necessarily depended upon treating A.P.'s decades-old, uncharged, unadjudicated allegation as sufficiently reliable to establish what Adams had "knowingly engaged in" before. On this record, deference does not require accepting a Rule 403 balance that derives substantial probative force from an untested accusation while discounting the collateral credibility contest and propensity risk that accusation created.

¶60 Here, by contrast, A.P.'s allegations were never prosecuted, never adjudicated, and never admitted by Adams. The jury therefore was asked to decide not only whether R.A. was credible, but also whether A.P. was credible regarding an allegation from nearly thirty years earlier. That is precisely the kind of collateral credibility contest that exacerbates the "mini-trial" problem and increases the risk the jury will give undue weight to the mere existence of a similar accusation. *Pelletier* underscores that point. There, the Court found the uncertain truth of the prior allegation part of what reduced its probative value and heightened the risk of unfair prejudice. *Pelletier*, ¶¶ 25-28.

¶61 The majority does not adequately account for that problem. Instead, it effectively assumes the truth of A.P.'s accusation in order to assign it probative value. Rule 403 requires a more disciplined inquiry.

## C. Similarity alone cannot carry the State's burden under Rule 403

¶62 There is no question A.P.'s and R.A.'s allegations shared notable similarities. Both girls said they were brought into Adams's home because their mothers could not care for them; both were later adopted; both described abuse beginning when they were young;

29

both described oral, anal, and vaginal conduct; both said Adams's wife was absent during the abuse; and both described gifts and whiskey. Those similarities explain why the State sought the evidence.

¶63     But similarity is not self-justifying. If similarity alone were enough, Rule 403 would do little work in child-sex cases, where the danger of unfair prejudice is already unusually acute. *Peterson* expressly warns that child sexual abuse evidence is "highly inflammatory." *Peterson*, ¶ 22. The more similar the prior allegation, the more carefully courts must guard against the jury's use of the evidence for the impermissible inference: if he did it before, he did it again.

¶64     The majority reasons that A.P's allegations were not "more abhorrent" than the charged conduct because the allegations were similar to R.A.'s. That observation does not resolve the Rule 403 question. Evidence need not be more inflammatory than the charged offense to be unfairly prejudicial. When the other act is nearly identical to the charged act, the danger is different but equally serious: the jury may treat the prior accusation as direct corroboration that the charged accusation is true. In that setting, similarity increases probative value and propensity danger at the same time. Rule 403 requires courts to account for both sides of that equation.

¶65     The majority also reasons that Adams's general denial and false-memory defense made A.P.'s testimony more probative. I agree that the defense theory matters. But it does not answer the Rule 403 problem. When the State uses a remote, collateral accusation to rebut a false-memory defense, the inference becomes especially dangerous. It heightens the chance that the jury will decide that, because another alleged victim made a similar

30

accusation, this accusation must be true. That is not merely proof of intent or absence of mistake. It is practical corroboration through propensity. A defendant does not forfeit Rule 403 protection merely by denying the charge or by challenging the complaining witness's memory and credibility.

¶66     That danger was not theoretical here. In closing, the prosecutor argued the jury could consider whether, "[w]hen faced with a decision of whether or not to agree to adopt a young female, was it part of the defendant's preparation or plan to, in fact, do that, knowing that he had done it before and that he had benefited from sexually abusing [A.P.]?" The State also stressed that Adams apologized to A.P. and "knew it was wrong." Although the State prefaced its argument with limiting-instruction language, the quoted passage illustrates how readily the permitted "plan" theory merged into the forbidden inference: because Adams allegedly did this before and benefited from it, the jury could infer that he planned to do it again. Rule 403 exists to police precisely that risk.

¶67     This case therefore presents the narrow but important point that similarity can cut both ways. Similarity may increase probative value, but it also increases the danger that the jury will treat the prior allegation as direct proof of the charged allegation. When the prior allegation is decades old, uncharged, unadjudicated, and unsupported by evidence of a continuous course of conduct, similarity alone cannot complete the Rule 403 analysis.

**D. The final limiting instruction did not adequately reduce the danger of unfair prejudice**

¶68     I would not rest reversal on a separate ineffective-assistance holding, on the admission of the search-history evidence, or on a categorical statement that current law

invariably requires a limiting instruction before other-acts evidence is presented. M. R. Evid. 105 is request-based, and *Salvagni* altered prior practice. Adams did not request a contemporaneous instruction before A.P. testified, and I do not treat the absence of such an instruction as an independent unpreserved error.

¶69 But timing still matters under Rule 403 when the Court relies on the final instruction to reduce the prejudice from the evidence. Here, Adams proposed the model limiting instruction, but the jury received it only in the final charge, after it already had heard the search-history evidence and A.P.'s testimony.[1] Even if the absence of a contemporaneous instruction is not independently dispositive after *Salvagni,* it is relevant to whether the final instruction adequately reduced the danger of unfair prejudice from A.P.'s testimony.

¶70 The majority relies on the final instruction to conclude the risk of unfair prejudice was reduced. But where the jury first heard the search-history evidence and then heard a second adopted daughter accuse Adams of nearly identical abuse before receiving any limiting instruction, the later admonition did not provide the same protection as a contemporaneous instruction at the moment the evidence was received. Again, I do not rely on the admission of the search-history evidence as error. The search-history evidence matters here only because it was part of the evidentiary context in which the jury received A.P.'s testimony before being given a limiting instruction. Once the jury heard a second adopted daughter accuse Adams of nearly identical abuse, the later admonition could not reliably eliminate the natural tendency to treat that accusation as corroboration of R.A.'s

---

[1] The model instruction's comment states that the instruction should be given twice—before the other-acts evidence and again in the final charge.

account. I make only the narrower point: the majority gives the final instruction more curative force than it reasonably can bear in a credibility-dependent trial involving remote, uncharged, and unadjudicated other-acts evidence.

¶71 I do not consider the search-history evidence or the absence of a contemporaneous limiting instruction as separate claims of reversible error. Adams's preserved claim is that the District Court abused its discretion by admitting A.P.'s testimony under Rule 403. In deciding that preserved question, we must examine the evidentiary setting in which the jury received the testimony and the curative force the majority assigns to the final limiting instruction. Evidence does not reach a jury in isolation. The prejudice inquiry necessarily considers how the evidence was presented and how likely the jury was to use it for an improper purpose.

**IV. The authorities supporting admission are distinguishable; the authorities counseling exclusion are more on point**

¶72 In sum, *Given* and *Tecca* do not support admission here. *Given* involved a shorter gap, an admitted and adjudicated prior act the truth of which was not uncertain at the admissibility stage, narrower non-propensity purposes, and a limiting instruction before the sister testified. *Given*, ¶¶ 6, 25, 31, 33. *Tecca* involved a continuing pattern of similar conduct leading up to the charged offense. *Tecca*, 220 Mont. at 172-73, 714 P.2d at 138-39. This case is closer to *Ray*, *Pelletier*, and *Peterson*: *Ray* because the prior allegation was remote and unsupported by continuity; *Pelletier* because the truth of the prior allegation was uncertain and credibility was central; and *Peterson* because courts must take special care with highly inflammatory child-sex-abuse evidence and the practical risk of propensity

33

reasoning. *Ray*, 267 Mont. at 133-34, 882 P.2d at 1016; *Pelletier*, ¶¶ 25-28; *Peterson*, ¶¶ 22-26.

**V. The error was not harmless**

¶73 The State cannot show there is no reasonable possibility A.P.'s testimony contributed to the verdict. *Van Kirk*, ¶ 44. This was not a case with physical evidence establishing sexual abuse. The State had circumstantial corroboration, most notably, search-history evidence that Adams does not challenge on appeal. But that evidence does not make A.P.'s testimony harmless. The jury still had to decide whether R.A.'s allegations of the charged acts were true. The physical examination was normal. R.A. denied inappropriate touching to her medical provider when specifically asked. Defense witnesses testified they never observed signs of abuse, and the defense presented expert testimony that false memories can occur. Although the State offered explanations why normal examinations and delayed disclosure are common, that only underscores the point that the jury's verdict necessarily depended heavily on credibility.

¶74 In that context, testimony from another adopted daughter alleging materially similar abuse decades earlier carried enormous corroborative force. That is especially true because the State offered the evidence for mental state, motive, and plan, and then used it in closing to argue that Adams's decision to adopt a young female could be understood in light of what he allegedly had done before. It did not merely supplement the State's proof; it altered the evidentiary landscape by telling the jury that this had happened before to another child in substantially the same position. And the search-history evidence did not make A.P.'s testimony cumulative. Search terms could support an inference about sexual interest,

34

knowledge, or intent. A.P.'s testimony supplied something qualitatively different: a live witness who told the jury Adams had used the same familial relationship, the same adopted-daughter role, the same opportunity created by an absent spouse, the use of alcohol, and the same post-abuse gifts to commit nearly identical abuse many years before. That evidence did not merely duplicate the search history. It gave the State a second alleged victim whose testimony functioned as powerful corroboration of the charged victim. There is, at minimum, a reasonable possibility that this evidence contributed to the verdict. The State therefore cannot establish harmlessness.

## VI. I would not reach ineffective assistance of counsel

¶75 Because I would reverse and remand for a new trial on the Rule 403 issue, I would not decide Adams's ineffective-assistance claim. That course is the narrower and more disciplined one. The record is sufficient to resolve the evidentiary issue, and that issue alone requires a new trial. By contrast, the ineffective-assistance claim raises additional questions about counsel's obligations regarding the timing of limiting instructions after *Salvagni* and Rule 105 that need not be resolved to decide this appeal.

## VII. Conclusion

¶76 The problem in this case is not that the State failed to articulate a permissible Rule 404(b) purpose. It did. The problem is that Rule 403 required the District Court to decide whether the actual non-propensity value of the evidence justified the grave danger that the jury would use a decades-old, uncharged, unadjudicated accusation as proof that Adams committed the charged offenses.

¶77 Because the evidence was extraordinarily remote, unsupported by continuity, uncertain in its truth, and freighted with an exceptional risk of unfair prejudice, I would hold that its probative value was substantially outweighed by the danger of unfair prejudice. Because there is a reasonable possibility the evidence contributed to the verdict, I would reverse and remand for a new trial. I therefore respectfully dissent.

/S/ KATHERINE M. BIDEGARAY

Justices Ingrid Gustafson and Laurie McKinnon join in the dissenting Opinion of Justice Katherine M. Bidegaray.

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON